**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1944-14T1

IN THE MATTER OF THE SUSPENSION
OR REVOCATION OF THE LICENSE OF:

STEVEN C. BRIGHAM, M.D.
LICENSE NO. MA05106800

TO PRACTICE MEDICINE AND SURGERY
IN THE STATE OF NEW JERSEY.

_____

Argued May 10, 2018 – Decided September 7, 2018

Before Judges Simonelli, Rothstadt and Gooden
Brown.

On appeal from the New Jersey Department of
Law and Public Safety, Division of Consumer
Affairs, State Board of Medical Examiners.

Joseph M. Gorrell argued the cause for
appellant Steven C. Brigham (Brach Eichler,
LLC, attorneys; Joseph M. Gorrell, of counsel
and on the brief; Richard B. Robins, on the
brief).

Steven N. Flanzman, Senior Deputy Attorney
General, argued the cause for respondent Board
of Medical Examiners (Gurbir S. Grewal,
Attorney General, attorney; Andrea M.
Silkowitz, Assistant Attorney General, of
counsel; Jeri L. Warhaftig, Senior Deputy
Attorney General and Christopher Salloum,
Deputy Attorney General, on the brief).

PER CURIAM

Appellant Steven C. Brigham, M.D. treated patients seeking to terminate late second and third trimester pregnancies by initiating dilation and/or fetal demise in New Jersey and later conducting the abortion procedure in Maryland. He held a New Jersey license to practice medicine and surgery, but held no license in Maryland. He alleged he complied with Maryland law by performing the procedures in consultation with a Maryland-licensed physician. He challenges the revocation of his New Jersey license by respondent State Board of Medical Examiners (BME). For the reasons that follow, we affirm.

I.

Brigham's Background

Brigham received a medical degree in 1986. His main training for performing abortions occurred in medical school during a "short preceptorship" with a physician for obstetrics and gynecology (ob/gyn), during which he observed and conducted a few first trimester abortion procedures. After graduation, he served a one-year internship, which included several weeks in an emergency room. He then worked in various hospital emergency rooms until accepting a position in a practice specializing in gynecology.

In 1992, Brigham opened his own medical practice in Voorhees. Over the years, he conducted his practice at several offices in

Mount Laurel and Voorhees, including American Women's Services, American Medical Services, American Wellness Center, American Women's Center, American Medical Associates, American HealthCare Services, Grace Medical Care, and Grace Medical Services. None of these facilities was a licensed hospital or New Jersey licensed ambulatory care facility (LACF).

During the course of his career, Brigham held licenses to practice medicine in Florida, New Jersey, New York, and Pennsylvania. He never held a license to practice medicine in Maryland or had hospital privileges in New Jersey or privileges to practice in any LACF, and was not board certified in ob/gyn.

### The TOP Rule

N.J.A.C. 13:35-4.2, the termination of pregnancy rule (the TOP rule) "is intended to regulate the quality of medical care offered by licensed physicians for the protection of the public." N.J.A.C. 13:35-4.2(a). During the time period in question here, September 2009 through August 2010, the TOP rule provided that "[t]he termination of a pregnancy at any stage of gestation is a procedure, which may be performed only by a physician licensed to practice medicine and surgery in the State of New Jersey." N.J.A.C. 13:35-4.2(b).

In June 2011, the Legislature amended N.J.A.C. 13:35-4.2(b), which was after the events at issue here, but before the

Administrative Law Judge's (ALJ) initial decision and the BME's final decision in this matter. See 43 N.J.R. 1359(b) (June 6, 2011) (adoption); 42 N.J.R. 1310(a) (July 6, 2010) (proposal). The amendment "clarif[ied] that the [TOP] rule does not apply to the provision of a medication to a patient designed to terminate a pregnancy." 42 N.J.R. 1310(a), at 1311. Thus, after June 6, 2011, N.J.A.C. 13:35-4.2(b) provided:

> The termination of a pregnancy at any stage of gestation is a procedure, which may be performed only by a physician licensed to practice medicine and surgery in the State of New Jersey. "Procedure" within the meaning of this subsection does not include the issuing of a prescription and/or the dispensing of a pharmaceutical.
>
> [43 N.J.R. 1359(b), at 1364.]

The remaining subsections of the TOP rule establish the criteria for eligibility to perform abortions and where they can be performed. These subsections separated the stages of pregnancy in terms of weeks from the start of the woman's last menstrual period (LMP), i.e., post conception. N.J.A.C. 13:35-4.2(c). For example, twelve weeks' gestational size, or roughly the first trimester, was the equivalent of fourteen weeks LMP. Ibid. The TOP rule has no requirements for terminating pregnancies before fourteen weeks LMP.

A-1944-14T1

Generally, in New Jersey, the second trimester was beyond fourteen weeks LMP to twenty-eight weeks LMP, and the third trimester was beyond twenty-eight weeks LMP to delivery. "Late" second trimester meant beyond twenty weeks LMP until the third trimester. But see Stenberg v. Carhart, 530 U.S. 914, 923-25 (2000) (stating second trimester runs from twelve through twenty-four weeks); Planned Parenthood of Ctr. N.J. v. Farmer, 165 N.J. 609, 634 (2000) (stating second trimester is beyond fourteen to twenty weeks LMP).

As a pregnancy progressed, N.J.A.C. 13:35-4.2(d) to (g) dictated increasingly stringent conditions for abortions. Beyond fourteen weeks LMP, abortions had to be performed only in a licensed health-care facility. N.J.A.C. 13:35-4.2(d). Within that category, "any termination procedure other than dilatation and evacuation (D & E) shall be performed only in a licensed hospital." Ibid. By contrast, "a D & E procedure" could be performed by a physician in a licensed hospital or in an out-patient LACF authorized to perform surgical procedures beyond fourteen weeks LMP but only through eighteen weeks LMP. N.J.A.C. 13:35-4.2(e).

Beyond eighteen weeks LMP through twenty weeks LMP, the physician planning to perform the D & E procedure in a LACF authorized for surgical procedures also had to have admitting and

surgical privileges at a nearby hospital, which was accessible within twenty minutes driving time, and which had an operating room, blood bank, and intensive care unit.  N.J.A.C. 13:35-4.2(f)(2) and (3).  The physician had to first file documentation with the BME, signed by the LACF's medical director, that he or she was certified or eligible for certification by the American Board of Obstetrics-Gynecology or the American Osteopathic Board of Obstetrics-Gynecology.  N.J.A.C. 13:35-4.2(f)(1).  The physician also had to cooperate with the medical director to maintain statistical records showing the number of patients who: (1) "received termination procedures"; (2) "received laminaria or osmotic cervical dilators [and] failed to return for completion of the procedure"; (3) "reported for postoperative visits"; (4) "who needed repeat procedures"; (5) "received transfusions"; (6) who had a suspected perforation; (7) "developed pelvic inflammatory disease within two weeks"; (8) "were admitted to a hospital within two weeks"; and (9) "died within [thirty] days." N.J.A.C. 13:35-4.2(f)(7).  In addition, the LACF had to have a credentials committee and a written agreement with an ambulance service, insuring immediate transportation of patients when necessary.  N.J.A.C. 13:35-4.2(f)(3) and (4).

After twenty weeks LMP, the physician "may request" permission from the BME "to perform D & E procedures in an LACF,"

A-1944-14T1

and must provide "proof, to the satisfaction of the [BME], of superior training and experience as well as proof of support staff and facilities adequate to accommodate the increased risk to the patient of such procedure."  N.J.A.C. 13:35-4.2(g).

<u>Medical Terminology: Laminaria,
Misoprostol and Digoxin</u>

Laminaria are a natural product, which have the property of swelling over time after insertion inside a woman's cervix to aid dilation for gynecological procedures.  They were developed as an alternative to mechanical devices that could lacerate the cervix. Laminaria have been used as a cervical dilator in the United States for at least twenty years.  As an expert explained:

> Laminaria are a type of dilating device with the property of becoming swollen by being exposed to fluids over time.  So if you put a Laminaria device, which is a naturally-occurring product, sometimes derived from seaweed, other times from the dogwood tree, and other naturally-occurring substances, if you put that stick into a glass of water or any fluid, over time it will swell up.  So when you put it in the cervix, the opening into the woman's uterus, the natural secretions of the cervix will cause the dilating device to swell over time.  And in about six hours or so, it assumes about [seventy] to [eighty] percent of its eventual maximum dilation.

Misoprostol, also known as Cytotec, is a powerful medication administered for cervical preparation.  It causes the cervix to soften.  In late second and third trimester abortions, (beyond

A-1944-14T1

sixteen to eighteen weeks LMP), Misoprostol is used to accomplish cervical softening, typically in conjunction with Laminaria used for dilation. As an expert explained:

> Misoprostol is a prostaglandin which is a family of chemicals that has the property of stimulating uterine contractions, and in so doing, helping the uterus to expel any pregnancy content. It also has the property of causing the uterus to increase its tone, which can be effective in preventing hemorrhage or reducing blood loss after pregnancy has ended. And it also can soften and dilate the cervix, which means it has uses outside of pregnancy[.] [I]t has multiple uses in the field of obstetrics and gynecology and in other fields.

Misoprostol is a known toxic agent to the fetus, i.e., potentially harmful to the fetus should the patient reverse her decision to abort. Sometimes after receiving Misoprostol, the patient will spontaneously abort.

Digoxin is a drug administered to an in utero fetus by injection and results in irreversible intra-uterine fetal demise (IUFD). An expert explained that the act of causing fetal demise "will cause a process that will irreversibly result in labor and delivery over time if it [is not] facilitated by a medical practitioner."

A-1944-14T1

In 1993, the BME filed a complaint against Brigham, seeking to suspend or revoke his New Jersey license.  In re Suspension or Revocation of License of Brigham, 96 N.J.A.R.2d (BDS) 35 (N.J. Adm. 1996) (Brigham I).  The complaint alleged, in part, that Brigham's insertion of laminaria in patients who were beyond fourteen weeks LMP "constitute[d] the commencement of an abortion in the second trimester."  This treatment allegedly violated the TOP rule because Brigham was not legally qualified to perform abortions, as he held no privileges in any hospital, had no formal ob/gyn training, and was not Board-eligible or Board-certified in any specialty.

Specifically, the complaint alleged that patient J.K. was over twenty-three weeks LMP and carrying a demised fetus when Brigham inserted Laminaria into her cervix in New Jersey.  He again inserted Laminaria the next day, intending to transport J.K. to New York the following day for the abortion procedure.  At that time, he was licensed to practice medicine in New York.  However, J.K. was admitted to a New Jersey hospital with complications on the evening after the second Laminaria insertion, and Brigham was not directly involved in the rest of her treatment.  The complaint further alleged that patient B.A. was beyond fourteen weeks LMP.

Brigham inserted Laminaria in New Jersey and completed the rest of his treatment in New York.

The BME adopted the ALJ's findings of fact and conclusions of law that Brigham did not violate the TOP rule by commencing a termination of pregnancy beyond fourteen weeks LMP using Laminaria. The ALJ noted the TOP rule was silent about the insertion of Laminaria for purposes of dilating the cervix preparatory to the removal of the fetus and the placenta. The ALJ concluded:

> It is clear that insertion of [L]aminaria does not terminate a pregnancy. It is likewise clear that it is a necessary step in achieving adequate cervical dilation so that evacuation of the uterus can be accomplished safely. The [BME] is of course free to interpret the scope of its rule on the termination of pregnancy, in accordance with reason, fairness, and adequate notice to those who are regulated. It would be well if the rule specifically addressed the use of [L]aminaria, as I am convinced that Dr. Brigham would not have utilized the procedure in New Jersey for patients beyond the [fourteenth] week of pregnancy if the rule expressly defined [L]aminaria insertion as a termination procedure.

Accordingly, the BME penalized Brigham only for using certain misleading terms in his advertising, not for violating the TOP rule. The BME made no other comment regarding the applicability of the TOP rule.

## The Phillips Letters

By 1996, the governing medical boards in Florida and New York revoked Brigham's licenses to practice medicine in those states. By January 1999, he was sending his patients to Pennsylvania to complete their second and third trimester abortions, even though he voluntarily retired his Pennsylvania medical license in 1992.

In January 1999, subsequent to Brigham I, Stuart Phillips, Esq., wrote to the BME regarding "Laminaria insertion in the office." Without identifying Brigham as his client, Phillips requested an advisory opinion regarding the TOP rule. He presented a scenario involving a second trimester abortion performed by a D & E procedure, and said that Laminaria insertion to dilate the cervix would be performed in a doctor's office and then one or two days later the evacuation surgery would be performed either in a hospital or a licensed/approved facility.

Phillips asked whether the treatment protocol he described would violate the TOP rule and suggested that Brigham I held insertion of Laminaria in an office setting was not a violation. However, he did not explain that the evacuation surgery would be performed in an out-of-state facility, and did not seek guidance on any other methods of cervical preparation prefatory to an evacuation surgery, such as administering Misoprostol or Digoxin.

A-1944-14T1

The BME advised Phillips that it shared his view of the applicability of the TOP rule, and advised "there would appear to be no problem with regard to the insertion of [L]aminaria prefatory to a termination of pregnancy whether in an office setting or a licensed ambulatory care facility."

### Brigham's Patients and Treatment Protocol

From September 2009 through August 2010, Brigham induced dilation and/or fetal demise in approximately 241 patients in his New Jersey offices. He then performed the evacuation surgeries in his office in Elkton, Maryland, which Brigham and his staff called "the surgical center."

All of the 241 patients sought to terminate pregnancies after fourteen weeks LMP, and all were first treated by Brigham in his New Jersey offices. Patients who were between fourteen weeks LMP but less than twenty-four weeks LMP were designated on their medical records as "American Woman Services" or "AWS" patients. Forty-three patients who were at least twenty-four weeks LMP or greater were designated on their medical records as "Grace" patients.

Brigham's treatment protocol for each type of patient was different, but all patients were treated first with some combination of Laminaria, Misoprostol, and/or Digoxin. For an AWS patient, treatment was a two-day procedure. Brigham's staff would

12                                                    A-1944-14T1

examine the patient in his Voorhees office, perform an ultrasound, collect lab work, and have the patient sign various consent forms. Brigham would then examine the patient, answer any questions, insert Laminaria, and send the patient home after telling her the evacuation surgery would be performed the next day in a surgical facility located about an hour away. The next day, the patient would return to the Voorhees office and receive another Laminaria insertion and sometimes Misoprostol. That same day, the patient would travel by car to the Elkton office and undergo an evacuation surgery performed by Brigham or, after July 30, 2010, by Nicola Riley, M.D., a Maryland licensed physician employed by Brigham.

For a Grace patient, who was typically in the late second or third trimester (twenty-four weeks LMP or later), treatment was a three-day procedure. Brigham's staff would examine the patient in his Mount Laurel office and perform an ultrasound to confirm pregnancy. His staff would tell the patient the evacuation surgery would be performed in another office located about an hour from Voorhees, have her sign various consent forms, collect payment, and then tell her to follow a staff member for a twenty-minute drive to the Voorhees office. That same day, Brigham would meet the patient at his Voorhees office, describe the surgical procedure, review the consent forms with the patient, answer any

A-1944-14T1

questions, and insert Laminaria and administer Digoxin to cause fetal demise.

On the second day of treatment, the Grace patient would return to the Voorhees office and have an ultrasound to confirm fetal demise. Brigham would insert Laminaria and the patient would return home. On the third day, the patient would return to the Voorhees office and then travel by car to the Elkton office, where she would undergo a surgical evacuation performed by Brigham or, after July 30, 2010, by Riley.

None of the AWS or Grace patients were given the address of the Elkton office unless they asked, and most did not. Patients traveled to that office in their own car, led in a caravan by one of Brigham's employees, or they could ride in a staff member's car. Brigham followed in another car, and everyone stayed in contact by cell phone during the drive. None of the patients were told that Brigham had no license to practice medicine and surgery in Maryland. The patients who testified at the administrative hearing said this would not have mattered to them had they known before their abortions.

## Brigham's Employees

George Shepard, Jr., M.D. was an Obstetrician/Gynecologist in his mid-80s and held a license to practice medicine in Maryland until the Maryland State Board of Physicians (Maryland Board)

permanently revoked it on November 19, 2010. The Maryland Board found Shepard practiced medicine with, or aided, Brigham, an unauthorized person, in the practice of medicine.

In his August 19, 2010 statement to Detective Sergeant Holly Smith of the Elkton Police Department, Shepard said he had trouble with his right arm, stopped driving, suffered a stroke, which limited his ability to use his dominant side, stopped performing abortions in 2001, and had not seen any patients, medically, since 2001.[1] He also said he worked at the Elkton office only two days a week, was paid monthly, and Brigham hired him two years earlier.

Shepard said his responsibilities at the Elkton office were "just to make sure that the facility [was] clean, and they treat the patients well[.]" He said he did not conduct any hiring or firing or give instructions "to the staff unless . . . they're just not doing something right," and never instructed the doctors. He also said that Brigham did not hire him to assist, instruct, or teach the doctors, and he was at the Elkton office only to make sure the patients were feeling well when they left.

---

[1] Shepard did not testify at the administrative hearing. His statement was admitted into evidence.

Shepard also said that Brigham performed the evacuation surgeries at the Elkton office, while Riley observed.[2] According to Shepard, Riley looked over Brigham's shoulder as he was telling her "what he's doing, and how he would do it or, you know, if you're going to do anything, don't do this, or don't do that." Shepard claimed he was "sitting there . . . in the same room, but . . . not looking over [Brigham's] shoulder" or "get[ting] up and walk[ing] around and see[ing] what [Brigham was] doing." Shepard explained that the patient would be covered, so he would not see or do anything. He was just sitting there waiting to see how long the procedure would take. He was not concerned that Brigham had no license to practice medicine in Maryland so long as a Maryland licensed physician was present.

It is undisputed that Shepard never performed any surgical evacuations in the Elkton office. Nevertheless, he signed the patient forms stating that the procedures were performed and the patients were fine when they left. However, he never saw an ultrasound or physically touched a patient.

Brigham employed "Dr. F.N.", a physician licensed only in Bangladesh, as a medical reviewer. In the beginning of her employment, she worked as a trainee, traveled in the car with

---

[2]  Riley was not interviewed by Smith and did not testify at the hearing.  The Maryland Board revoked her medical license as well.

Brigham's patients from Voorhees to Elkton, and observed less than twenty surgical evacuations in the Elkton office. Dr. F.N. testified that Brigham and Riley performed all of those surgeries, with Shepard being either in the room or on the speakerphone. Dr. F.N. saw Shepard only twice in the operating room.

Dr. F.N. testified that when they were on the telephone, Brigham would tell Shepard about the patient. She sometimes overheard them conversing about complications, such as amniotic fluid embolism, uterine rupture and perforation, uterine perforation, disseminated intravascular coagulation, or post-procedure hemorrhage. She also testified that at the direction of someone whom she could not recall, she would write Shepard's name or "Dr. Walker's" name on the medication logs. However, she did not remember seeing anyone named Dr. Walker at the Elkton office and "could not remember her face."

Smith interviewed Kimberly M. Walker, M.D.[3] Walker told Smith that she never performed any evacuation surgeries at the Elkton office, but was present for fifty surgeries Brigham performed. Walker did not have a license to practice medicine or surgery in Maryland when she worked at the Elkton office.

---

[3] Walker did not testify at the hearing.

A.H. worked in the Voorhees and Mount Laurel offices before becoming project manager in the Elkton office for second and third trimester patients. Prior to her promotion, she conducted patient intakes and counseling, assisted the doctors, and worked in the recovery room.

A.H. testified that Shepard introduced himself to patients at the Elkton office as the "medical director" and reviewed the patient charts with Brigham prior to each surgery. During the surgery, Shepard took the patient's pulse, monitored oxygen saturation and pain levels, sometimes instructed Brigham to give the patient more anesthesia, and always talked with Brigham about the surgery while it was ongoing. A.H. also saw Shepard instructing Brigham about repositioning the fetus through vaginal/uterine massage.

A.H. testified that Shepard would meet with patients after the surgery to ensure their pain was being managed. Shepard and Brigham also would review and sign the patients' charts after each procedure. Sometimes during a surgery, the staff would take notes on the vital signs and hand the notes to a doctor for entry in the chart. According to A.H., only the doctors wrote on the patient records.

On cross-examination, A.H. testified she was at the Elkton office approximately forty times between November 2009 and March

2010. She stated that Shepard was sometimes on the speakerphone during the surgeries. She also claimed it was her job to fill in the doctor's name on the consent forms for the Grace patients, and it was her error that the forms did not contain the doctor's name.

C.R. worked in the Voorhees office. Her duties included traveling to Maryland with patients and monitoring them in the recovery room after their surgeries. She testified that Shepard introduced himself to patients at the Elkton office as "the medical director," and talked to Brigham during the surgeries about the patient and the surgery. She also saw Shepard demonstrating to Brigham maneuvers to position the fetus, and both of them reviewing medical records together. She further stated she was responsible for writing Shepard's name on the recovery room logs, and Shepard instructed her to write his name since he was the medical director, and not Brigham's name.

K.G. worked in the Mount Laurel office. She met patients at the office, gave them consent forms, answered their questions, explained the entire process, and performed ultrasounds. She testified that the patient would meet with Brigham, who explained the process, answered questions, and went over the consent form. She claimed that during her approximately twenty intakes with patients, only three patients asked for the address of the surgical center, which she gave to them.

19                                                    A-1944-14T1

K.G. testified she saw Shepard driving himself from his home to the Elkton office, and he was physically able to help patients off the operating room table. She said that Shepard would meet each patient, make sure the patient was not in too much pain, and decide the order of the surgeries.

K.J., a foreign medical school graduate trained in emergency medicine, but not licensed in the United States, worked in the Elkton office and previously worked in the Voorhees office, where she conducted patient intakes, explained procedures and consent forms, and drove patients to the Elkton office. During intakes, she gave AWS patients the choice of going to an office in either Pennsylvania or Maryland for their evacuation surgeries, and most picked Maryland since it was three hours closer. If patients asked about the Maryland office, she would tell them the facility was in Elkton, but very few asked about the location.

K.J. testified that prior to accepting a patient in the Elkton office, Brigham discussed the case over the telephone with Shepard, and it was Shepard who decided whether to accept the patient for surgery. Shepard introduced himself to patients at the Elkton office as the "medical director," decided the order of their surgeries, and made sure patients were not in pain during the procedure. Shepard also discussed complications with Brigham and

A-1944-14T1

showed him more than one "obstetrical maneuver." K.J. said Shepard never performed any of the abortions.

K.J. said that Brigham and Shepard had "a form that they used to sign where it says Dr. Shepard is the Medical Director and they are engaging in consultation, him and Dr. Brigham . . . and [she] saw Dr. Shepard signing that form several times." K.J. described Shepard as mentally intact and initially able to drive himself.

### Brigham's Patient Records

Patient D.B. was an AWS patient. She signed Laminaria-insertion and use-of-Misoprostol consent forms and a preprinted form entitled "Informed Consent for Abortion after 14 Weeks," which was blank where the name of the doctor who would perform the abortion should have been inserted. Brigham's name did not appear in her records. Instead, a note from Riley stated she performed the abortion by herself as "the attending physician." There was also a completed form entitled, "Second Trimester Non-Surgical Abortion," but the section for "Delivery Notes" was crossed out, and a form entitled "Daily Tissue and Regulated Medical Waste Log," which showed D.B.'s name and Shepard as the doctor. Complications arose after D.B.'s abortion and Brigham's staff told her family members who had accompanied her to the Elkton office to take her to the hospital.

A-1944-14T1

Patient V.O. was an AWS patient. She signed a Laminaria-insertion consent form and a preprinted form entitled "Informed Consent for Abortion after 14 Weeks," which showed Brigham's name as the doctor who would perform the abortion. Shepard and Brigham signed her "Abortion Record." Brigham admitted that approximately one month after the abortion, he and Shepard signed the forms and he wrote his name onto the consent form, along with a statement on the Abortion Record: "Non-viable fetus removed by Dr. Brigham while engaging in consultation with Dr. Shepard."

Patient S.B. was an AWS patient. She signed Laminaria-insertion and use-of-Misoprostol consent forms, and an "Informed Consent for Abortion after 14 Weeks" form, which was blank where the name of the doctor who would perform the abortion procedure should have been inserted. She was nineteen weeks LMP, and had received Laminaria on August 10, 2010. According to the "Medication [Dispensing] Log," Brigham administered Doxycycline on August 10, 2010. She had an abortion on August 11, 2010, and the Elkton Recovery Room Log indicated that Shepard was the doctor.

Patient S.A. was an AWS patient. She signed Laminaria-insertion and use-of-Misoprostol consent forms, and a preprinted form entitled "Informed Consent for Abortion after 14 Weeks," which was blank where the name of the doctor who would perform the abortion should have been inserted. Her records also contained a

22

completed form entitled, "Second Trimester Non-Surgical Abortion," but the section for "Delivery Notes" was crossed out. She had her abortion at the Elkton office on August 11, 2010, and the Recovery Room Log indicated that Shepard was the doctor.

Patient A.C.'s patient records indicated she was an AWS patient. She signed Laminaria-insertion and use-of-Misoprostol consent forms, and a preprinted form entitled "Informed Consent for Abortion after 14 Weeks," which had no name of the doctor performing the procedure. There was also a completed form entitled, "Second Trimester Non-Surgical Abortion," but the section for "Delivery Notes" was crossed out. She had her abortion at the Elkton office on August 11, 2010, and the Recovery Room Log indicated that Shepard was the doctor.

Records of many other Grace and AWS patients of Brigham, who did not testify, were admitted into evidence, along with Recovery Room Logs from the Elkton office. To summarize, each of the patient records in evidence contained an "Abortion Record," which stated: "The patient [ ] did [ ] did not, spontaneously deliver the fetus and placenta." On each form, the "did" box was checked, indicating a spontaneous delivery. Almost all of the preprinted forms entitled "Informed Consent for Abortion after 14 Weeks," did not include the name of the doctor who would be performing the abortion procedure. All of the Elkton Recovery Room Logs reflected

23                                                                          A-1944-14T1

Shepard as the "doctor" for each of the 241 patients treated there. The Recovery Room Logs displayed data for each patient, including stage of pregnancy, fee paid, type of sedation and whether the patient was a "Grace" patient. Brigham's name did not appear on the Recovery Room Logs.

### Expert Testimony

Edward Steve Lichtenberg, M.D., testified for the BME as an expert in ob/gyn with a specialty in contraception and family planning, including the performance of abortions in all trimesters. He defined "termination of pregnancy," often called an abortion, as an "induced abortion . . . designed to complete the emptying of the uterus using only medications, devices or both." This was distinct from "a spontaneous abortion or miscarriage." He also distinguished fetal demise from feticide, which occurred when fetal demise happened "at the hands of a practitioner or the patient."

Lichtenberg testified that a D&E was "a surgical abortion performed beyond the first trimester." The steps involved in a D&E were counseling, consent, cervical preparation, and extraction of the products of conception. During counseling, a patient would be informed about the medical facts of her condition as verified by an ultrasound, assessed by a medical team, and advised of her

options, including abortion, adoption, carrying to term, or further counseling.

Lichtenburg explained that during consent, the patient would sign a consent form on which she expressed her intent to go forward with a surgical abortion, and be informed of the name of the surgeon and the various features and risks of the procedure. Although some consent forms did not include the individual surgeon's name, such as when groups of physicians were working together, "typically a single senior physician is identified on most consent forms."

Lichtenburg also explained that during cervical preparation, devices, medications, or other actions would be applied to cause the cervix to soften and dilate over time. Lichtenberg testified that "the degree of cervical dilation necessary to safely evacuate the uterus increases with increasing gestation, and gestation progresses geometrically, not linearly." He then opined that Brigham failed to provide his patients seeking second and third trimester abortions with competent medical care, in part, because he never told them he was not licensed in Maryland, and this failure breached the bond of trust between patient and physician.

Lichtenberg testified that Brigham's ineligibility to perform the evacuation surgery in New Jersey did not alleviate him from the responsibility of engaging in a relationship of trust with his

patients.  He further opined that Brigham's plan for patient travel also deviated from accepted standards of care because the patients were instructed to follow a line of cars without knowing their ultimate destination.

Lichtenberg also opined that Brigham's patient records deviated from accepted standards, including the requirements in N.J.A.C. 13:35-6.5.  He explained that the consent forms Brigham's patients signed insufficiently warned of serious consequences, often did not contain the name of the designated surgeon, and contained inconsistent information that the patient would be receiving both a medical (non-surgical) and a surgical abortion. He concluded Brigham never contemplated that any of his patients would undergo a medical abortion.  Further, each patient's Abortion Record reflected a spontaneous abortion when, by definition, a spontaneous abortion occurred without physician assistance in the delivery of the fetus and placenta.

Lichtenberg opined that Brigham's patient records, in their aggregate, demonstrated "serious deviations" from accepted standards of care, and these "serious deviations" made it difficult to know whether there were defects in any step of the termination of pregnancy.  He stated that "when there are blanks in the chart, when notations are absent, it's hard to know exactly what went on."  He noted there was "no reasonable explanation" why data

would be missing from patient records, since records should be filled out "at the time of the operation."

Lichtenberg opined that Brigham's conduct was a gross deviation from the standard of care, since he performed second and third trimester abortions outside a LACF or hospital. He explained that the increased risks encountered as a pregnancy advanced resulted in the need for facilities of "higher quality with more equipment and more resuscitative measures and higher quality staff to handle possible complications."

M. Natalie McSherry, a Maryland lawyer, testified for Brigham as an expert in general health care law, particularly regarding the practicing, licensing, and disciplining of medical professionals in Maryland. She explained that Maryland had a statutory exception to its licensure requirements, which permitted out-of-state physicians to practice in Maryland if they were engaging in "consultation" with a Maryland-licensed physician. However, she found no authority interpreting that exception. Rather, she relied on her experience interacting with physicians to conclude that "consultation" meant "a couple of health care providers talking to each other about the care of a patient." Thus, she opined that Brigham was engaging in "consultation" with Shepard and therefore permitted to perform abortions in Maryland.

27

McSherry also refuted the testimony of Christine Farrelly, a fact witness for the BME. Before becoming the Acting Executive Director of the Maryland Board, Farrelly worked as a compliance analyst investigating complaints about Brigham's treatment of patients in Maryland. Testifying about Maryland's law, Farrelly stated the Maryland Board had a form posted on its website since 2003 that had to be submitted for approval when an out-of-state physician sought to practice medicine in Maryland under the licensure requirement exception. McSherry testified, however, that she was unaware of this form, despite her involvement in many healthcare cases before the Maryland Board, and said there was no rule, regulation, or order requiring submission of the form.

Gregg P. Lobel, M.D., testified for Brigham as an expert in anesthesiology. He opined that Brigham's use of Midazolam, an anti-anxiety medication, would cause the patients, even without any other drugs, to experience amnesia and likely not remember what happened during their surgeries. He testified he could not discern from the patient records whether D.B. had received more medication than had been documented before she had a complication requiring emergency hospital treatment after her surgery.

Gary Mucciolo, M.D., testified for Brigham as an expert in ob/gyn and pregnancy terminations. He opined that an abortion or termination of pregnancy meant the procedure of evacuation or

A-1944-14T1

"surgical intervention" for "emptying of the uterus of pregnancy contents[;]" an abortion did not constitute administering Laminaria or Misoprostol, or inducing fetal demise. He explained that the accepted general standard of care allowed a physician to send the patient home after receiving prefatory steps on one or two days, and perform the surgical evacuation on the following day.

On cross-examination, Mucciolo agreed with Lichtenberg's explanation that the risks increased as pregnancy advanced, but opined a second trimester abortion, like a first trimester abortion, was a "minor" surgery. However, he admitted that he referred his patients requiring IUFD, like Brigham's Grace patients, to a perinatologist to perform the injections, and then had their abortions performed in a hospital where he held privileges.

Mucciolo opined that Brigham's consent forms and patient records met the general standard of care because they gave patients "a clear understanding" of the procedures that would be performed. However, he admitted that Brigham's use of "spontaneous" in the Abortion Records was a "little confusing." Nevertheless, he still believed he could get a clear understanding of the procedures Brigham performed from the records.

## Brigham's Testimony

Brigham testified that he opened offices in Maryland to avoid anti-abortion protestors and because women in New Jersey who were pregnant past twenty-four weeks could not terminate their pregnancies any closer than Colorado. He did not tell his patients about his Elkton office because he wanted to keep the address confidential to avoid problems with protestors. He did not establish the Elkton office until he consulted legal counsel concerning Maryland's laws for unlicensed physicians and, consequently, signed a "Consultation Engagement Agreement" with Shepard in September 2009. The agreement stated, in part:

> WHEREAS, Dr. Shepard desires that Dr. Brigham engage in consultation with him regarding the care and treatment of patients, and
>
> WHEREAS, provided that it comports with Maryland law, Dr. Brigham is willing to consent to Dr. Shepard's request that Dr. Brigham start engaging in consultation with him,
>
> NOW, THEREFORE, it is hereby AGREED:
>
> 1.   Dr. Shepard hereby requests that Dr. Brigham enter into this Engagement in which Dr. Brigham agrees that he shall be engaging in consultation with Dr. Shepard regarding the care and treatment of patients.
>
> . . . .
>
> 3.   During the Term of this engagement, Dr. Brigham shall at all times remain

engaging in consultation with Dr. Shepard, as provided herein.

Brigham described his interaction with his patients, i.e., counseling, examinations, and review of the records and consent forms. He explained that patients beyond twenty-four weeks LMP, the Grace patients, were non-elective cases and had to present justifiable reasons to terminate their pregnancies. He claimed he declined more patients than he accepted, and Shepard participated in those decisions.

Brigham testified that Shepard was the medical director at the Elkton office, supervising staff and hiring Riley. Before that, Shepard had stopped treating patients and was working for him as the medical and lab director in his Baltimore office. Shepard's role at the Elkton office was to decide the order of the surgeries and monitor patients' vital signs during and after surgery. Shepard also taught him about significant complications and obstetrical maneuvers. In return, he taught Shepard about specific medical procedures so Shepard could oversee the physicians in his role as medical director.

On cross-examination, Brigham asserted he never performed an evacuation surgery in the Elkton office when he was not consulting with Shepard or Riley. He testified that on those "few times" when Shepard was listening on the telephone, Shepard would speak

A-1944-14T1

to the staff by speakerphone and would listen for the pulse oximeter. Brigham insisted that, even on the telephone, Shepard could give him advice and consultation. However, he admitted that if there was a problem, Shepard would not have been able to step in and render emergency care or assistance. Even so, he stated he had "a lot of emergency medicine background," and there were other physicians who were present and could have assisted, such as Dr. F.N. and Walker, even though they were not licensed to practice medicine in Maryland.

Brigham also explained that Shepard would leave the premises before they could complete the patient records together, so the records were often incomplete. He claimed the Maryland police seized most of the patient records before they could be competed. The following colloquy occurred between Brigham and his attorney regarding his patient records:

> Q. Now, some of the records in this case do not have a filled out abortion record as is contained in the [V.O.] case.
>
> You are aware of that, correct?
>
> A. I am.
>
> . . . .
>
> . . . [B]ecause I was not licensed in Maryland and I was doing these procedures with Dr. Shepard, I wanted to document it, that Dr. Shepard was there and that Dr. Shepard - - or, at least that Dr. Shepard was engaging in

consultation, and I wanted to create a documentary record.

. . . .

I wanted to have Dr. Shepard's signature on the record to prove that he was, I would say in [ninety-eight] percent of the time, [ninety-nine] percent of the time he was there, and if he wasn't there in person he was there by telephone, to show that a consultation did - - that he, himself, concurred that he was engaging in consultation with me. So I wanted him to sign it, and I signed it [V.O.'s patient records].

. . . .

Dr. Shepard always has this issue that he had to get home to get his kids. . . . [O]ur typical [mode of operation] was that we would sit down at the end of the day and sign all of the documents, but sometimes he had to rush out and didn't have time to actually do all the documentation.

. . . .

. . . [W]e had fallen behind on doing our documentation, and then the police basically came in and seized them, and that was it.

. . . .

That is my answer. [The patients' records] are just not complete. They were seized before we could have a chance to finish completing them.

Brigham testified that no one was ever lost while traveling to Maryland, and the caravan kept in touch by cell phone. He also testified that he spoke to the head of the emergency room at

Christiana Hospital in Newark, Delaware, who had verbally agreed to accept and treat any of his patients, if necessary.

### Summary of the ALJ's Initial Decision and the BME's Final Decision

The ALJ first concluded that Brigham did not violate the TOP rule by inserting Laminaria or inducing fetal demise in New Jersey. The ALJ explained the TOP rule applied only when the physician commenced the surgical process to evacuate the uterus in a D&E procedure, and did not regulate the entire process beginning with consultation and counseling and proceeding through prefatory steps to the surgery, including dilation and/or initiation of fetal demise. Thus, because Brigham had not performed any surgical evacuations in New Jersey, the ALJ recommended dismissal of the charge that his treatment violated the TOP rule.

The ALJ concluded Brigham's patient records provided sufficient information concerning the recorded surgical procedures, and Brigham's consent forms were sufficiently comprehensive. Thus, the ALJ recommended the BME find that any alleged violations of the professional standards of care to maintain proper patient records were "relatively minor."

However, the ALJ concluded that Brigham was not authorized under Maryland law to practice medicine there. The ALJ found Brigham had knowingly obtained Shepard's cooperation only for

legal reasons and not for the medical consultation that would have allowed Brigham to practice in Maryland. Citing to Brigham's past conduct, specifically, the disciplinary actions by the medical boards in New York, Pennsylvania, and Florida, and a New York conviction for failing to file income taxes, and to his "willingness to play fast and loose with the law in Maryland[,]" the ALJ concluded Brigham "has finally cut enough corners." The ALJ therefore recommended the BME find Brigham had committed a "major violation of professional standards" by engaging in the unlicensed practice of medicine in Maryland, and revoke his license for "knowingly effectuat[ing]" a scheme to engage in the unlicensed practice of medicine and surgery.

The BME rejected the ALJ's conclusion on the applicability of the TOP rule, and held that Brigham commenced pregnancy terminations in New Jersey and violated the TOP each time he performed any prefatory act in his New Jersey office for a patient whose treatment was ultimately completed in Maryland. However, relying on Brigham I and the Phillips letters, the BME found Brigham could have reasonably believed his conduct was not subject to the TOP rule when he treated patients with Laminaria and/or Misoprostol in New Jersey. Consequently, for penalty purposes only, the BME found Brigham violated the TOP rule in forty-three Grace cases when he administered Digoxin to effect fetal demise

in New Jersey prior to conducting the surgical evacuation in Maryland.

The BME adopted the ALJ's finding that Brigham's arrangement with Shepard was a deliberate sham and his conduct constituted the unlicensed practice of medicine in Maryland. Accordingly, the BME held that Brigham's unlicensed practice of medicine in Maryland substantiated the charges that he had engaged in acts constituting a crime or offense relating adversely to the practice of medicine, and provided the basis for disciplinary sanction and revocation of his license.

The BME also adopted the ALJ's finding that Brigham's patient records failed to conform to regulatory recordkeeping requirements. Although the BME agreed with the ALJ's characterization that these violations, in any individual case, were "minor," it held Brigham's "repeated and consistent" recordkeeping violations were "substantial" and "serious." The BME also held "the record of this case support[ed] the remainder of charges" that Brigham's conduct constituted: gross and/or repeated acts of negligence, the use or employment of dishonesty, deception, and/or misrepresentation, and professional misconduct.

As to penalty, the BME concurred with the ALJ's recommendation to revoke Brigham's license, but found the scope of Brigham's

violations of law was far more expansive and the extent of his misconduct far more pervasive than the ALJ's conclusions.

The BME held that Brigham committed multiple statutory violations when treating not less than 241 patients, which included forty-three Grace patients. Specifically, only as to his Grace patients, the BME found Brigham violated N.J.S.A. 45:1-21(h) by "perform[ing] termination of pregnancy procedures in New Jersey in violation of [the TOP rule]." For all of his patients, the BME found Brigham violated: (1) N.J.S.A. 45:1-21(b) for "two independent bases" of dishonesty, deception, misrepresentation, false promise or false pretense for failing to inform patients of salient facts and for consistent deceptive recordkeeping practices, which the BME merged for penalty purposes; (2) N.J.S.A. 45:1-21(c) by engaging in acts constituting gross negligence; (3) N.J.S.A. 45:1-21(e) by engaging in acts of professional malpractice; (4) N.J.S.A. 45:1-21(f) by engaging in acts constituting "the unlicensed practice of medicine in Maryland[;]" and (5) N.J.S.A. 45:1-21(h) by failing "to maintain patient records consistent with the requirements of N.J.A.C. 13:35-6.5[.]" Thus, the BME "unanimously conclude[d] that no action short of revocation of licensure could adequately redress the violations of law found or adequately protect the public interest." The BMA also imposed monetary penalties. This appeal followed.

II.

Our review of a final administrative decision is limited. <u>In re Stallworth</u>, 208 N.J. 182, 194 (2011). We "afford a 'strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated responsibilities." <u>Lavezzi v. State</u>, 219 N.J. 163, 171 (2014) (quoting <u>City of Newark v. Nat. Res. Council, Dep't of Envtl. Prot.</u>, 82 N.J. 530, 539 (1980)). Thus, "[w]ithout a 'clear showing' that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record, an administrative agency's final quasi-judicial decision should be sustained, regardless of whether a reviewing court would have reached a different conclusion in the first instance." <u>Circus Liquors, Inc. v. Governing Body of Middletown Twp.</u>, 199 N.J. 1, 9 (2009).

Our review of an administrative decision is limited to three questions: (1) whether the decision is consistent with the agency's governing law and policy; (2) whether the decision is supported by substantial evidence in the record; and (3) whether, in applying the law to the facts, the agency reached a decision that could be viewed as reasonable. <u>Ibid.</u> Implicit in the scope of our review is a fourth question, whether the agency's decision offends the State or Federal Constitution. <u>George Harms Const. Co. v. N.J.</u>

Tpk. Auth., 137 N.J. 8, 27 (1994). The burden of proof is on the party challenging the agency's action. Lavezzi, 219 N.J. at 171.

The Legislature has granted the BME "broad authority" under the Medical Practices Act (MPA), N.J.S.A. 45:9-1 to -27.9, to regulate the practice of medicine in New Jersey, and "to promulgate rules and regulations to protect patients and licensees." In re License Issued to Zahl, 186 N.J. 341, 352 (2006); N.J.S.A. 45:9-1 and -2. "The Board's supervision of the medical field is critical to the State's fulfillment of its 'paramount obligation to protect the general health of the public.'" Id. at 353 (quoting In re Polk, 90 N.J. 550, 565 (1982)). The BME is "the guardian of the health and well-being of [State] citizens." Polk, 90 N.J. at 566. Thus, the right of physicians to practice their profession is subordinate to the government's interest "to assure the health and welfare of the people of the State through the regulation and supervision of the licensed medical profession." Id. at 565.

In tandem with the MPA, the BME has the power to discipline and regulate the license of any physician in New Jersey under the Uniform Enforcement Act (UEA), N.J.S.A. 45:1-14 to -27. N.J.S.A. 45:1-21; Del Tufo v. J.N., 268 N.J. Super. 291, 296 (App. Div. 1993). The BME may revoke a physician's license under the UEA if the physician:

b.   Has engaged in the use or employment of dishonesty, fraud, deception, misrepresentation, false promise or false pretense;

c.   Has engaged in gross negligence, gross malpractice or gross incompetence which damaged or endangered the life, health, welfare, safety or property of any person;

d.   Has engaged in repeated acts of negligence, malpractice or incompetence;

e.   Has engaged in professional or occupational misconduct as may be determined by the board;

f.   Has been convicted of, or engaged in acts constituting, any crime or offense involving moral turpitude or relating adversely to the activity regulated by the board.  For the purpose of this subsection a judgment of conviction or a plea of guilty, non vult, nolo contendere or any other such disposition of alleged criminal activity shall be deemed a conviction;

      . . . .

h.   Has violated or failed to comply with the provisions of any act or regulation administered by the board[.]

[N.J.S.A. 45:1-21.]

"The remedial nature of the UEA suggests its liberal interpretation."  In re Kim, 403 N.J. Super. 378, 386 (App. Div. 2008) (citing N.J.S.A. 45:1-14).  Importantly, "the Legislature did not require a finding of patient harm before authorizing license revocation[ under] N.J.S.A. 45:1-21[.]"  Zahl, 186 N.J.

at 355 (finding physician's deceitful and fraudulent conduct warranted license revocation). These violations, however, must be proven by a preponderance of the evidence in a medical disciplinary hearing. Polk, 90 N.J. at 560.

We afford substantial deference to a professional board's disciplinary action and choice of sanction because of the board's specific expertise, special knowledge, and statutory obligation to regulate the licensed profession. Zahl, 186 N.J. at 353. For statutory disciplinary proceedings, "[t]he issues, the evidence and the standards are thoroughly understood by the parties involved. They relate to a profession, a specialty in which the parties, the witnesses and the members of the tribunals are all uniquely qualified and share a common expertise." Polk, 90 N.J. at 567-68. Accordingly, our Supreme Court repeatedly has admonished that reviewing "courts should take care not to substitute their own views of whether a particular penalty is correct for those of the body charged with making that decision." Stallworth, 208 N.J. at 191 (quoting In re Carter, 191 N.J. 474, 486 (2007)).

Nevertheless, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Ardan v. Bd. of Review, 231 N.J. 589, 604 (2018) (quoting US Bank, N.A. v. Hough, 210 N.J. 187, 200 (2012)). We

consider those issues de novo.  L.A. v. Bd. of Educ. of Trenton,

221 N.J. 192, 204 (2015).  Moreover, "[w]hen resolution of a legal

question turns on factual issues within the special province of

an administrative agency, those mixed questions of law and fact

are to be resolved based on the agency's fact finding."  Campbell

v. N.J. Racing Comm'n, 169 N.J. 579, 588 (2001).

Brigham argues the BME's finding that he violated the TOP

rule was incorrect as a matter of law, contrary to Brigham I, and

a violation of his right to adequate notice and due process of

law.  He relies on N.J.A.C. 13:35-4.2(b), which stated at the time

of his conduct in question: "The termination of pregnancy at any

stage of gestation is a procedure, which may be performed only by

a physician licensed to practice medicine and surgery in the State

of New Jersey."

Brigham first claims the BME's conclusion he violated that

section is contrary to the plain language of the regulation,

illogical, and strains credulity.  He takes no issue with the

BME's concepts that termination of a pregnancy involves a continuum

of care, the focus of which is fetus evacuation from the uterus,

or that this continuum involves a process.  Instead, he notes the

TOP rule discusses termination in terms of a "procedure," and not

a continuum of care or a process.  Relying on the experts'

testimony, he asserts that inserting Laminaria or administering

Misoprostol and Digoxin constitute preparations for the termination procedure, i.e., dilation and fetal demise, but do not constitute performance of the surgical evacuation procedure itself.

Brigham further argues that by finding he violated the TOP rule, the BME contradicted Brigham I that insertion of Laminaria was prefatory to performing an evacuation procedure and did not contravene the TOP rule, and the BME's changes to the TOP rule should have been made after formal rulemaking without violating his right to adequate notice and due process of law.

The BME has discretion to define the TOP rule as commencing with any or all prefatory steps to terminate a pregnancy, and as applying "to all steps along the continuum which are taken for the distinct purpose of allowing a physician to safely perform a termination procedure[.]" The MPA gives the BME "broad authority" to regulate and supervise the practice of medicine in New Jersey and to protect patients. Zahl, 186 N.J. at 352-53.

However, the problem here is that Brigham never performed an evacuation surgery in New Jersey. There is nothing in the BME's express or implied powers under the MPA or UEA permitting it to hold a physician directly liable under the TOP rule for not performing a surgical evacuation in New Jersey that would violate the regulation if performed here, or hold a physician directly

liable for violating the TOP rule by performing a surgical evacuation in another state. The BME recognized it could not "establish standards of medical practice in States outside of New Jersey." Thus, the BME's discussions about viewing a termination of pregnancy as a process or a procedure are a red herring, since the TOP rule governs D & E procedures, that is, dilation <u>and</u> evacuation. Even if Brigham started the termination procedure in New Jersey, his surgical evacuations never occurred here.

Furthermore, N.J.A.C. 13:35-4.2(d) states that "[a]fter [fourteen] weeks LMP, any termination procedure other than . . . (D & E) shall be performed only in a licensed hospital." The BME, however, never found that inducing fetal demise terminates a pregnancy or constitutes a termination procedure. It declined to distinguish between reversible and irreversible prefatory steps to a surgical evacuation, instead finding that use of Laminaria, Misoprostol, and/or Digoxin were all prefatory acts to that procedure.

Because Brigham did not perform the surgical evacuations in New Jersey, the BME could not find Brigham violated the TOP rule. Accordingly, the BME's revocation of Brigham's license for violating the TOP rule was arbitrary, capricious, and unreasonable, as it was not based on sufficient credible evidence he performed the surgical evacuations in New Jersey. The BME

decision also contravened the plain language of the regulation, and went beyond its implied and express powers by trying to impose the TOP rule's reach into another state.

Having reached this conclusion, we decline to address Brigham's additional argument, raised for the first time on appeal, that the TOP rule is unconstitutional.

### III.

Brigham contends the BME erred in denying his motion to dismiss the TOP rule violation and gross negligence claims as barred by the doctrine of collateral estoppel. We disagree.

The doctrine of collateral estoppel "bars relitigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action." In re Liquidation of Integrity Ins. Co., 214 N.J. 51, 66 (2013) (quoting Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 114 (2011)). This doctrine also applies in administrative settings. Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991).

For collateral estoppel to apply:

> the party asserting the bar must show that:
> (1) the issue to be precluded is identical to
> the issue decided in the prior proceeding; (2)
> the issue was actually litigated in the prior
> proceeding; (3) the court [or agency] in the
> prior proceeding issued a final judgment on
> the merits; (4) the determination of the issue

was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

[In re Estate of Dawson, 136 N.J. 1, 20 (1994) (citations omitted).]

"It is equally clear that '[e]ven where these requirements are met, the doctrine, which has its roots in equity, will not be applied when it is unfair to do so.'" Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 521-22 (2006) (alteration in original) (quoting Pace v. Kuchinsky, 347 N.J. Super. 202, 215 (App. Div. 2002)).

Our Supreme Court has identified "a variety of fairness factors" favoring application of collateral estoppel, including: "conservation of judicial resources; avoidance of repetitious litigation; and prevention of waste, harassment, uncertainty and inconsistency." Allen v. V & A Bros., Inc., 208 N.J. 114, 138 (2011) (quoting Olivieri, 186 N.J. at 523). In contrast, the fairness factors weighing against application of collateral estoppel include consideration of whether:

the party against whom preclusion is sought could not have obtained review of the prior judgment; the quality or extent of the procedures in the two actions is different; it was not foreseeable at the time of the prior action that the issue would arise in subsequent litigation; and the precluded party did not have an adequate opportunity to obtain a full and fair adjudication in the prior action.

[Ibid. (quoting Olivieri, 186 N.J. at 523).]

Also weighing against preclusion is "a concern that 'treating the issue as conclusively determined may complicate determination of issues in the subsequent action[.]'" Ibid. (quoting Restatement (Second) of Judgments § 29 (Am. Law Inst. 1982)). Indeed, collateral estoppel will not be applied "where, after the rendition of the judgment, events or conditions arise which create a new legal situation or alter the rights of the parties." Kozlowski v. Smith, 193 N.J. Super. 672, 675 (App. Div. 1984) (quoting Washington Twp. v. Gould, 39 N.J. 527, 533 (1963)). Another example is when "new evidence has become available that could likely lead to a different result." Barker v. Brinegar, 346 N.J. Super. 558, 567 (App. Div. 2002).

Thus, "[t]he relevant focus 'must center on whether the conditions precedent to the application of the collateral estoppel doctrine have been satisfied and, if so, whether the application of the doctrine is equitable under the circumstances.'" L.T. v. F.M., 438 N.J. Super. 76, 86 (App. Div. 2014) (quoting R.D., 207 N.J. at 116).

Brigham argued on his motion to dismiss that the legal issues before the BME were identical to the issues raised in Brigham I, namely, determining what act constitutes a termination of pregnancy as governed by the TOP rule. He asserted the BME

47

resolved this issue in Brigham I when it dismissed the disciplinary violations based on injecting Laminaria in his New Jersey offices on patients who were past fourteen weeks LMP, and then performing their evacuation surgeries in New York. He maintained the Phillips' letters reinforced the BME's policy that his treatment plan did not violate the TOP rule. Thus, he argued that collateral estoppel barred those claims alleging he violated the TOP rule when performing any prefatory acts to the evacuation of a fetus and placenta, including use of Laminaria, Misoprostol, or Digoxin.

The BME denied the motion, finding that collateral estoppel did not apply because there were "substantial differences" between the issues presented here and in Brigham I. The BME never reached the issues in Brigham I of whether Laminaria insertion in a New Jersey office setting was conduct that commenced the termination of a pregnancy and therefore triggered the TOP rule, or whether Brigham was subject to the TOP rule once he inserted Laminaria into his patients. In fact, it was "not at all clear that the dismissal [in Brigham I] was based on a conclusion that the insertion of [L]aminaria was not an act that triggered the requirements of N.J.A.C. 13:35-4.2."

Second, the BME found differences in the ways that Brigham treated his patients in the two cases. It explained:

[In Brigham I, Brigham] had inserted [L]aminaria [into patient J.K.] on two instances in his office, and he had intended to transport J.K. the following day to a clinic in New York ("an additional two hour" trip) to perform a D & E. There was no allegation made, however, that [Brigham] ever administered or intended to administer [M]isoprostol, a cervix softening compound, to J.K. before embarking on the planned trip to New York. It is thus the case that the question whether the administration of [M]isoprostol was an act that "commenced" an abortion (or otherwise subjected . . . Brigham to the requirements of the [BME's] termination regulation) was never considered, or even before the [Office of Administrative Law] or the [BME], in the prior action. Nor was any consideration given to the question whether it was negligent or grossly negligent to administer [M]isoprostol to a patient (who had previously had [L]aminaria inserted also to effect cervical softening) and then have that patient travel over [fifty] miles to an out-of-state location for the actual performance of her abortion.

In similar fashion, a crucial issue in the present application — namely, whether the administration of [D]igoxin to cause fetal demise is an act that constitutes the commencement of a termination procedure, and/or an act that needs to be performed in a manner consistent with the requirements of the [BME's] termination rule — was neither considered nor decided in the prior case, because J.K. was not administered [D]igoxin. It is alleged in three of the five specifically identified cases now before the [BME] (S.D., M.L. and J.P.) that . . . Brigham injected [D]igoxin to kill the patient's fetus (or fetuses) at the same time that he inserted [L]aminaria to effect cervical softening. Whether . . . Brigham thereby engaged in acts which subjected him to the requirements of the

[BME's] termination regulation is a new question, and clearly was not an issue resolved in the 1993 action.

Third, the BME found that <u>Brigham I</u> did not consider the adequacy of the informed consent that Brigham obtained. The BME noted that in <u>Brigham I</u>, patient J.K. had been "fully aware and advised who would be performing her procedure and where that procedure would be perform[ed." However, here, Brigham's patients were not advised where their procedures would be performed, nor, in some cases, who would be performing them.

Fourth, there was no allegation in <u>Brigham I</u> that Brigham was not licensed to perform the D & E procedures in New York, or was not in full compliance with New York law. He was licensed in New York when he inserted Laminaria in his patients in New Jersey, intending to perform the evacuation surgery in New York. In the present case, however, he was never licensed in Maryland, where he intended to perform the evacuation surgery.

Finally, the BME rejected any claims that the Phillips letters supported application of collateral estoppel to dismiss the present charges. It explained:

> The letter[s] clearly do[] not address any practice other than insertion of [L]aminaria in an office setting — indeed, Mr. Phillips expressly stated that his [unnamed] client was looking for an opinion "only as to that procedure." . . . Brigham's suggestion that the letter[s] should be read to somehow

A-1944-14T1

endorse other actions performed in an office setting that may be "prefatory" to an abortion, such as the injection of [D]igoxin or administration of [M]isoprostol, is not only strained, but also directly contrary to text in his attorney's letter. Mr. Phillips was thus careful to point out that the insertion of [L]aminaria affected only the cervix, was a reversible procedure, and "did not kill the fetus" or evacuate the uterus. Digoxin injections prior to a D & E procedure are done for a completely different purpose — to kill the fetus. Given that distinction, we find . . . Brigham's suggestion that the letter should presently be interpreted to condone his injections of [D]igoxin in patients M.L., S.C. and J.P. to be entirely baseless.

Other significant distinctions need to be drawn between the facts now before the [BME] and those posited in Mr. Phillips' letter. Mr. Phillips clearly, and repeatedly, asserted in his letter to the [BME] that the D & E procedure which was to follow the insertion of [L]aminaria was going to be performed in a manner completely consistent with the [BME's] termination regulation and New Jersey law. Mr. Phillips did not suggest that the D & E procedure would be performed in another state, by a physician who would not otherwise be qualified under the [BME's] regulation to perform the procedure, or in any setting other than an approved LACF or hospital. Nor did Mr. Phillips suggest that the D & E procedure might be performed by a physician other than the physician inserting the [L]aminaria, or that the physician's office was far removed from the site at which the D&E was to be performed.

Thus, the BME denied Brigham's motion due to the substantial differences between the current claims and Brigham I, and the

distinctions between Brigham's recent conduct and the conduct addressed in the Phillips letters

On appeal, Brigham argues the BME should have applied collateral estoppel to dismiss the TOP violation and gross negligence claims since he had met all five of the Dawson prongs. He reiterates that the same issues of what act commenced a pregnancy termination procedure and whether his conduct and treatment plan constituted gross negligence were presented in Brigham I and the present action, and the BME answered the issues by ruling in Brigham I that insertion of Laminaria in an office setting did not violate the TOP rule. He reiterates the Phillips letters reinforced the Brigham I ruling, wherein the BME declared that a medical treatment plan requiring the patient to travel one hour out-of-state for an evacuation surgery after Laminaria insertion in New Jersey was lawful and consistent with generally accepted standards of medical care.

There is no real dispute that Brigham met the third, fourth, and fifth Dawson prongs, 136 N.J. at 20. However, he did not meet the first and second prongs. Under the first prong, the prior action must have involved substantially similar or identical issues. Ibid. Some courts have required the issues to be "precisely the same[.]" In re Liquidation, 214 N.J. at 68. This prong therefore requires consideration of

> [1] whether there is substantial overlap of evidence or argument in the second proceeding; [2] whether the evidence involves application of the same rule of law; [3] whether discovery in the first proceeding could have encompassed discovery in the second; and [4] whether the claims asserted in the two actions are closely related.
>
> [First Union Nat'l Bank v. Penn Salem Marina, Inc., 190 N.J. 342, 353 (2007).]

Here, even though the BME alleged in both actions that Brigham violated the TOP rule by commencing pregnancy terminations on patients after fourteen weeks LMP in his New Jersey office and then completing the termination out of state, the actual issues here were not the same or similar as in Brigham I. In Brigham I, the BME was never faced with deciding whether, and what, prefatory acts to the D & E procedure triggered compliance with the TOP rule. There was also no substantial overlap of evidence, since Brigham's prefatory steps in this case included Laminaria insertion, along with administration of Misoprostol and/or Digoxin.

Further, even though the BME had alleged similar claims in both actions that Brigham's treatment constituted gross negligence, the actual issues were not the same or similar. Brigham held a license to practice medicine in New York and could perform evacuation surgeries there, and the BME in Brigham I was never faced with deciding whether his treatment plan constituted

gross negligence. Consequently, discovery in Brigham I could not have encompassed the evidence discovered in this case.

Moreover, under the second Dawson prong, an "issue is actually litigated" if the issue "is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined[.]" Allesandra v. Gross, 187 N.J. Super. 96, 105-06 (App. Div. 1982) (quoting Restatement (Second) of Judgments § 27, cmt. d (Am. Law Inst. 1982)). By contrast, an issue is not "actually litigated" when, although it is raised, "no decision with respect thereto was ever rendered" by the prior tribunal. Id. at 106-07.

Here, although both actions concerned the TOP rule and the BME's licensing authority under N.J.S.A. 45:1-21, it was not clear the BME dismissed the claims in Brigham I based on its conclusion that Brigham's prefatory act of inserting Laminaria was not a step that triggered the TOP rule. Since Brigham held a license to practice medicine in New York, the BME was not faced in Brigham I with interpreting alleged violations of the TOP rule by a physician who had no license to perform the ultimate surgical evacuation. Nor did the BME consider whether it was negligent or grossly negligent for Brigham to insert Laminaria and/or administer Misoprostol to a patient who was going to travel to a state where he could perform her evacuation surgery. Consequently, the similar

issues presented in both actions were not actually decided in Brigham I.  As such, because Brigham did not meet the first and second Dawson prongs, the BME did not err by concluding collateral estoppel did not bar the TOP rule violation and gross negligence claims.

In any event, the BME ultimately did not base its decision on Brigham's treatment of patients only with Laminaria insertion and/or administration of Misoprostol.  In its final decision, the BME found "Brigham could have reasonably believed, based on the holdings made in 'Brigham I' and . . . the Phillips letters, that he would not have been subject to the . . . [TOP rule] in cases which involved only the insertion of [L]aminaria and/or the administration of Misoprostol."  Consequently, the BME held Brigham only violated the requirements of the TOP rule each time he injected Digoxin to effect IUFD in a late term pregnant patient. Accordingly, we conclude the BME did not err by denying Brigham's motion, as collateral estoppel did not compel the dismissal of any claim.

## IV.

Brigham contends the BME erred in revoking his license under N.J.S.A. 45:1-21(f) for engaging in acts constituting the unlicensed practice of medicine in Maryland.  We reject this contention.

The BME may revoke any license to practice medicine and surgery "upon proof" that the licensee "[h]as . . . engaged in acts constituting, any crime or offense involving moral turpitude or relating adversely to the activity regulated by the [BME]." N.J.S.A. 45:1-21(f).  The standard of proof is by a preponderance of the evidence.  <u>Polk</u>, 90 N.J. at 560.

This issue involves the interpretation of Maryland law and its relation to the facts.  An agency's interpretation of a statute or determination of a strictly legal issue is not entitled to deference, and we will consider these issues de novo.  <u>Ardan</u>, 231 N.J. at 608.  Further, "[w]hen resolution of a legal question turns on factual issues within the special province of an administrative agency, those mixed questions of law and fact are to be resolved based on the agency's fact finding."  <u>Campbell</u>, 169 N.J. at 588 (citation omitted).  Applying those review standards, we discern no error.

In Maryland, physicians are governed currently by the Medical Practice Act, found in the Maryland Code Annotated, Heath Occupation §§ 14-101 to 14-702.  <u>Cornfeld v. State Bd. of Physicians</u>, 921 A.2d 893, 897 (Md. Ct. Spec. App. 2007).  The Act is administered by the Maryland Board, which has both licensing and disciplinary responsibilities.  <u>Ibid.</u>

During the period of Brigham's conduct at issue, Maryland required individuals to be licensed in order to practice medicine there. Md. Code Ann., Health Occ. § 14-301; 1997 Md. Laws, ch. 201, § 1, at 1924 (Apr. 29, 1997, effective Dec. 31, 1998). Maryland law defined "practice medicine" as:

> (1) "Practice medicine" means to engage, with or without compensation, in medical:
>
> (i)   Diagnosis;
> (ii)  Healing;
> (iii) Treatment; or
> (iv)  Surgery.
>
> (2) "Practice medicine" includes doing, undertaking, professing to do, and attempting any of the following:
>
> (i) Diagnosing, healing, treating, preventing, prescribing for, or removing any physical, mental, or emotional ailment or supposed ailment of an individual:
>
> . . . .
>
> 2.  By appliance, test, drug, operation, or treatment; [and]
>
> (ii) Ending of a human pregnancy[.]
>
> [Md. Code Ann., Health Occ. § 14-101(l); 2007 Md. Laws, ch. 539, § 1, at 3504-05 (May 17, 2007, effective June 1, 2007).]

Maryland law further states: "Except as otherwise provided in this title, a person may not practice, attempt to practice, or offer to practice medicine in this State unless licensed by the

A-1944-14T1

Board."  Md. Code Ann., Health Occ. § 14-601; 2007 Md. Laws, ch. 359, § 1, at 2283 (May 8, 2007, effective Oct. 1, 2007).[4]  A person found violating any of those statutes was guilty of a crime and subject to criminal sanctions and fines, including imprisonment. Md. Code Ann., Health Occ. § 14-606(a)(4); 2007 Md. Laws, ch. 359, § 1, at 2283-84 (May 8, 2007, effective Oct. 1, 2007).[5]

However, there are certain exceptions to the licensing requirements.  During the period of Brigham's conduct at issue, the exception statute stated:

> (a)  Subject to the rules, regulations, and orders of the Board, the following individuals <u>may practice medicine without a license</u>:
>
> . . . .
>
> (2)  <u>A physician licensed by and residing in another jurisdiction, while engaging in consultation with a physician licensed in this State</u>;
>
> . . . .

---

[4]  In 2013, Maryland's General Assembly repealed and reenacted HO § 14-601 without change.  2013 Md. Laws, ch. 307, § 1, at 2295, and ch. 308, § 1, at 2297-98 (May 2, 2013, effective Oct. 1, 2013). It is the same today.  Md. Code Ann., Health Occ. § 14-601 (2014 repl. vol. & 2017 pocket pt.).

[5]  In 2013, Maryland's General Assembly repealed and reenacted HO § 14-606 with amendments not relevant here.  2013 Md. Laws, ch. 307, § 1, at 2296-97, and ch. 308, § 1, at 2298-99 (May 2, 2013, effective Oct. 1, 2013).  Today, violators are still guilty of a crime.  Md. Code Ann., Health Occ. § 14-606 (2014 repl. vol. & 2017 pocket pt.).

(5) A physician who resides in and is authorized to practice medicine by any state adjoining this State and whose practice extends into this State, if:

    (i) <u>The physician does not have an office or other regularly appointed place in this State to meet patients</u>; and

    (ii) The same privileges are extended to licensed physicians of this State by the adjoining state[.]

[Md. Code Ann., Health Occ. § 14-302(a) (emphasis added); 1993 Md. Laws, ch. 627, § 2, at 3068 (May 27, 1993, effective July 1, 1993).]

Brigham did not fit into the treating physician exception in HO § 14-302(a)(4), since New Jersey does not adjoin Maryland and, more importantly, since he had "an office or other regularly appointed place in [Maryland] to meet patients." Thus, in order to practice medicine in Maryland without a license, Brigham had to meet the consultation exception in HO § 14-302(a)(2).

In May 2013, Maryland's Governor signed "an emergency measure" adopted by the General Assembly for, among other things, "the purpose of authorizing certain physicians engaged in certain consultations to practice medicine without a license from the State Board of Physicians under certain circumstances," as it was "necessary for the immediate preservation of the public health or

safety[.]"  2013 Md. Laws, ch. 582, § 3, at 5203, and ch. 583,
§ 3, at 5213 (May 16, 2013, effective May 16, 2013).[6]  Consequently,
before the BME's final decision in this matter, HO § 14-302(a)(2)
was amended to provide:

> (a)  Subject to the rules, regulations, and
> orders of the Board, the following individuals
> may practice medicine without a license . . .
> :
>
>     . . . .
>
> (2)  A physician licensed by and
> residing in another jurisdiction,
> if the physician:
>
>     (i)  Is engaged in
>     consultation with a physician
>     licensed in the State about a
>     particular patient and does
>     not direct patient care[.]

> [Md. Code Ann., Health Occ. § 14-302(a)
> (emphasis added); 2013 Md. Laws, ch. 582, §
> 2, at 5195, and ch. 583, § 2, at 5206 (May 16,
> 2013, effective May 16, 2013).]

In its final decision, the BME revoked Brigham's license by
adopting the ALJ's conclusion that his conduct constituted the
unlicensed practice of medicine in Maryland.  In so doing, the BME
deferred to the ALJ's "persuasive" and "detailed discussion" of
Maryland's principles of statutory interpretation regarding the

_____

[6]  Pursuant to the Maryland Constitution, Article II, § 17(d): "If
the Bill is an emergency measure, it shall take effect when
enacted."

meaning of the consultation exception as it existed in 2009 and 2010.

The ALJ noted that even though the legal and medical experts clashed on Maryland's meaning of "consultation," they agreed the meaning of the term, as used in the statute, had not been the subject of any decision of the courts of Maryland or the Maryland Board. Finding no direct precedent, the ALJ used Maryland's accepted principles of statutory construction and relied on Connolley v. Collier, 385 A.2d 826, 829-30 (Md. Ct. Spec. App. 1978), aff'd, 400 A.2d 1107 (Md. 1979). In Connolley, the court recognized that, at times, the meaning of an unclear and ambiguous statutory word or phrase can be understood by examining subsequent legislation. Ibid. (citation omitted). Thus, the ALJ found the 2013 amendment of HO § 14-302(a)(2)(i) could "reasonably be seen as addressing any doubt about whether the sort of activity [Brigham] was engaged in was within the limited [consultation] exception . . . and not as a change to existing law." The ALJ explained:

> The amendment can be seen simply as the Legislature's re-assertion of the primacy of licensure by Maryland authorities for those who choose to practice medicine in that State, which was always implied by the fact that the "consultation" situation authorized in the first statute was but an exception and not a normal avenue for practice in the state.

In view of the above, it appears that the Maryland Court of Appeals, and on the administrative level, the Maryland Board of Physicians, would each determine that the consultation provision allowed only a very narrow exception to the general licensure requirement, and that it was always the intention of the Maryland Legislature to restrict such practice in line with the understanding that a Maryland physician and patients being treated in Maryland would benefit by the ability of Maryland doctors to consult about the treatment of their patients with out-of-state licensees who had some expertise or at least some special knowledge that could assist the Maryland doctor in that physician's care of his or her patient, care that the Maryland physician directed and was ultimately responsible for.

The ALJ therefore concluded that Brigham's employment of Shepard was not a valid consultation relationship within the meaning of Maryland law, since Brigham "surely did direct patient care," obtained Shepard's cooperation for legal reasons, and therefore had engaged in the unlicensed practice of medicine in Maryland. The BME agreed, further finding that the relationship between Brigham and Shepard "through the lens of medical practitioners . . . was anything but an ordinary or typical consultative relationship." The BME concluded:

Dr. Shepard possessed neither the skill set nor the experience level which one would typically expect from a medical consultant. Ordinarily, a treating physician requests that a consultant examine his or her patient because the consultant possesses specialized

A-1944-14T1

> knowledge and expertise above and beyond that held by the treating physician. . . .
>
> In this case, . . . Brigham did not need Dr. Shepard to perform any of the functions a true medical consultant would be expected to perform. The record below suggests that Dr. Shepard had never performed an abortion on a patient greater than 11 weeks LMP, and that he last performed an abortion in 2001. While we recognize that Dr. Shepard, as a Board-certified OB/GYN, may have had some knowledge about the general practice of obstetrics and gynecology different and apart from . . . Brigham, we reject any suggestion that . . . Brigham had any need to tap Dr. Shepard's knowledge base or any need to consult with him.
>
> . . . [I]t is patently obvious that Dr. Shepard was not then acting as a consultant. At best, at times that he was present in Elkton, Dr. Shepard performed functions that otherwise could have been performed by a nurse or qualified medical assistant. When he was present on the phone alone, he couldn't perform even those limited functions.

The BME also found the record was devoid of other indicia of a true consultative relationship between Brigham and Shepard. It noted there was no evidence that Shepard ever billed independently for performing a consultation, and no written or typed consultation report or note by Shepard in any patient record. Instead, the BME found the record showed Brigham employed and paid Shepard.

The BME also rejected Brigham's claim that Shepard was consulted on whether to accept patients for surgery. In addition to finding that such action was not sufficient to qualify any

63

doctor as a medical consultant, the BME found there was no documentation evincing any decision by Shepard on filtering patients. The BME determined that Brigham's claims were "entirely inconsistent with the recorded statement Shepard gave to Smith, which clearly suggested that Shepard played a far more limited and inconsequential role." The BME concluded:

> It is thus clear to us that, from a medical perspective alone, there is more than ample reason to adopt [the ALJ's] ultimate conclusions that any claimed consultative relationship was a sham and that . . . Brigham simply effectuated a scheme to allow him to practice in Maryland with no illusions that he had any actual need for medical consultation with Dr. Shepard.

Finally, the BME gave no weight to the fact that Brigham was not convicted or criminally charged with the unlicensed practice of medicine in Maryland. It explained that a New Jersey licensee could be sanctioned under N.J.S.A. 45:1-21(f) if he or she "'engage[d] in acts that constituted a crime or offense . . . relat[ing] adversely to the activity regulated by the [BME]." Thus, even if Brigham was not convicted or charged with any offense, he was subject to penalty in New Jersey for having engaged in the unlicensed practice of medicine in Maryland, since "the unlicensed practice of medicine in Maryland is in fact punishable as a crime, and that the crime would be one that relates adversely to the activity regulated by the [BME]." The BME stated: "[F]rom

the viewpoint of practicing physicians," it was "clear that the relationship between. . . Brigham . . . Shepard could not reasonably be considered to be a 'consultative' relationship." The BME also stated:

> We further clarify that the finding that . . . Brigham engaged in the unlicensed practice of medicine in Maryland substantiates the charges made within the Administrative Complaint that . . . Brigham engaged in acts which would constitute a crime or offense relating adversely to the practice of medicine, which in turn provides basis for disciplinary action in New Jersey pursuant to [N.J.S.A.] 45:1-21(f).

Brigham argues that the BME erred by ignoring his expert's testimony as to the meaning of consultation. He claims the BME improperly inserted a requirement not in the Maryland statute, that a consulting physician must examine the patient and/or possess specialized knowledge and expertise beyond that of the consultee or treating physician.

Citing various Maryland sources and the universal prohibition against ex post facto laws, Brigham posits there is no support for the BME to rely on the ALJ's interpretation and therefore apply the 2013 amendment in HO § 14-302(a)(2)(i) to evaluate his conduct. He insists the amendment was a complete change in the law, not a mere clarification, leads to absurd results, and contradicts the definition of consultation accepted by the experts, as "[o]ne

physician providing an opinion or assistance to another physician[.]" He claims the ALJ and BME misinterpreted the holding in <u>Connolley</u>, and should have applied Maryland's "rule of lenity," which requires a statute's ambiguity to be interpreted in favor of an individual charged with a violation due to fairness and lack of notice.

Finally, Brigham argues that even if the BME's definition of "in consultation with" in HO § 14-302(a)(2) was accurate, the preponderance of evidence proved his conduct came within that definition, as amended. He asserts: "The fact that . . . Shepard had skills that [he] did not and was present to communicate those skills plainly constitutes consultation." He avers it was immaterial whether Shepard was present during all of the surgeries, and his motivation for consulting with Shepard was irrelevant. Thus, he concludes the BME erred in revoking his license by finding he had violated N.J.S.A. 45:1-21(f).

In Maryland, as in New Jersey, the paramount goal of statutory interpretation is to "ascertain and effectuate the intent of the Legislature." <u>Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park</u>, 896 A.2d 1036, 1045 (Md. 2006). To discern the Legislature's intent, Maryland courts "look first to the plain language of the statute, giving it its natural and ordinary meaning." <u>Breslin v. Powell</u>, 26 A.3d 878, 891 (Md. 2011)

(quoting <u>State Dep't of Assessments & Taxation v. Maryland-Nat'l Capital Park & Planning Comm'n</u>, 702 A.2d 690, 696 (Md. 1997)). In <u>Breslin</u>, the court stated:

> If the language of the statute is clear and unambiguous, courts will give effect to the plain meaning of the statute and no further sleuthing of statutory interpretation is needed. If the sense of the statute is either unclear or ambiguous under the plain meaning magnifying glass, courts will look for other clues — e.g., the construction of the statute, the relation of the statute to other laws in a legislative scheme, the legislative history, and the general purpose and intent of the statute.
>
> [<u>Ibid.</u> (citations omitted).]

Here, the plain meaning of the statutory phrase, practicing medicine "while engaging in consultation with" a licensed Maryland physician, is ambiguous on the face of the version of HO § 14-302(a)(2) applicable at the time of Brigham's conduct. Thus, the BME did not err by looking for other clues.

Before discussing any impact of the 2013 amendment, the prohibition against ex post facto laws, and a rule of lenity, we note that the consultation exception to the physician licensing requirements was part of the original statutory scheme adopted by Maryland's General Assembly in 1888 to regulate practitioners of medicine and surgery. 1888 Md. Laws, ch. 429, §§ 1-10, at 697-700 (Apr. 5, 1888, effective Apr. 5, 1888) (codified as Md. Code

of Pub. Gen. Laws, Health, Art. 43 ("Practitioners of Medicine"), §§ 39-47[7]) (1888 Act).  The history of this 130-year-old exception is a more significant clue in divining the meaning of "in consultation with" in HO § 14-302(a)(2) and addressing Brigham's arguments.

The 1888 Act, entitled "an Act to promote the public health and regulate the practice of medicine in the State of Maryland," permitted three classes of persons to practice medicine: those who had graduated from a medical college; those who had passed an examination given by the State Board of Health; and those who had been practicing medicine in Maryland for ten years.  1888 Md. Laws, ch. 429, § 1-3, at 697-98; Md. Code, Health, Art. 43, §§ 39-41.  See generally Aitchison v. State, 105 A.2d 495, 498 (Md. 1954) (discussing history of the 1888 Act).  Anyone not possessing the required certificate or not already having practiced ten years was guilty of a crime.  1888 Md. Laws, ch. 429, § 8, at 699; Md. Code, Health, Art. 43, § 46.  However, expressly excepted from the statutory requirements were "commissioned surgeons in the United States army, navy or marine hospital service" and "physicians or

---

[7] John Prentiss Poe, The Maryland Code. Public General Laws, Vol. I, at 791-94 (Baltimore:  King Bros., 1888). Originally published in volume 389 of the Archives of Maryland series in 1888, and republished in 2001 by the Maryland State Archives. See Archives of Maryland Online at http://aomol.msa.maryland. gov/000001/000389/html/index.html (last visited Feb. 1, 2018).

surgeons not resident in this state, who may be called in consultation within this state." 1888 Md. Laws, ch. 429, § 6, at 699; Md. Code, Health, Art. 43, § 44. Thus, the nonresident physician was considered the consultant.

In 1892, the General Assembly repealed and reenacted those provisions with additions and amendments. 1892 Md. Laws, ch. 296, § 1, at 412-17 (Apr. 2, 1892, effective June 7, 1892) (codified as Md. Code of Pub. Gen. Laws, Health, Art. 43, §§ 39-52[8]). See Manger v. Bd. of State Med. Exam'rs, 45 A. 891, 892 (Md. 1900) (declaring that "the whole scheme devised by the Act of 1888 was swept away by the Act of 1892"). The language of the consultation exception to the licensing requirements was amended to exclude "physicians or surgeons in actual consultation from other States." 1892 Md. Laws, ch. 296, § 1, at 417 (emphasis added); Md. Code, Health, Art. 43, § 49[9] (Section 49) (emphasis added).

---

[8] John Prentiss Poe, Supplement to the Code of Public General Laws of Maryland, Containing the Public General Laws Passed at the Sessions of the General Assembly of 1890, 1892, 1894, 1896, 1898, at 330-35 (Baltimore: King Bros., 1898). Originally published in volume 391 of the Archives of Maryland series in 1898, and republished in 2001 by the Maryland State Archives. See Archives of Maryland Online at http://aomol.msa.maryland.gov/000001/000391/html/index.html.

[9] Poe, Supplement, at 335. See 1894 Md. Laws, ch. 217, §§ 1-2, at 271-75 (Apr. 6, 1894, effective Apr. 6, 1894); 1896 Md. Laws, ch. 194, §§ 1-2, at 311-14 (Apr. 4, 1896, effective Apr. 4, 1896).

In 1894 and 1896, the General Assembly added sections to Article 43 not relevant here, but did not change the language of the consultation exception in Section 49. Md. Code, Health, Art. 43, §§ 39-63.[10] In Manger, 45 A. at 893, a case concerning whether the appellant was grandfathered under the new provisions, the Court of Appeals harmonized both the 1892 and 1894 enactments by employing "a rule of very general application that statutes should be read so as to harmonize their various provisions[,] and so as to give effect to all their parts, if that be possible, rather than in a way to defeat or nullify any portion of them."

Meanwhile, a defendant who had been prosecuted for unlawfully practicing medicine in Maryland without being officially registered challenged the constitutionality of the licensing exceptions in Section 49 of the 1892 enactment. Scholle v. State, 46 A. 326, 326 (Md. 1900). The Court of Appeals rejected the defendant's claim, significantly explaining:

> Here the purpose of the Acts in question was the protection of the public from the consequences of ignorance and incapacity in the practice of medicine and surgery. As a means of effecting this[,] they exact from the persons proposing to engage in the business a certain degree of skill and learning, to be evidenced by a certificate upon which the

---

[10] Poe, Supplement, at 330-41. See 1894 Md. Laws, ch. 217, §§ 1-2, at 271-75 (Apr. 6, 1894, effective Apr. 6, 1894); 1896 Md. Laws, ch. 194, §§ 1-2, at 311-14 (Apr. 4, 1896, effective Apr. 4, 1896).

public may rely. . . . <u>Those to whom the provisions of the acts do not apply are</u> commissioned surgeons of the U.S. Army and Navy, and Marine Hospital; <u>physicians and surgeons in actual consultation from other states</u>; and persons temporarily practicing under the supervision of an actual medical preceptor.

The <u>reasons for these exemptions</u> from the operation of the Act are apparent and are entirely of a public character. The competency of the first class is assured by the exactions required of them before they could become commissioned in the service of the United States . . . . Nor can any reason having in view the public protection be assigned for requiring certificates of the remaining classes. Neither of these classes can be said to be practitioners within this State. <u>The physician from another State, "in actual consultation," has co-operating with him a registered physician</u>. To require him to license as for general practice [] would have no other effect than <u>occasionally</u> to <u>deprive the patient and the local physician of the benefits of the advice of some of the most eminent and skillful gentlemen in the profession</u>. Moreover, . . . <u>the public are fully protected from the incompetency of the foreign physician . . . by the presence and supervision and restraints of the certified physicians of the State</u>. This section therefore cannot be objected to as in any respect arbitrary or unreasonable, or as in any manner creating any unjust discrimination.

[<u>Id.</u> at 327 (emphasis added).]

In 1902, the General Assembly repealed Section 49. 1902 Md. Laws, ch. 612, §§ 1-2, at 883-91 (Apr. 11, 1902, effective Apr. 11, 1902) (codified as Md. Code of Pub. Gen. Laws, Health, Art.

43, §§ 39-65).  Nevertheless, it reenacted the consultation exception in a different section and added, for the first time, the out-of-state treating physician exception:

> [N]othing herein contained shall be construed to apply . . . to any physician or surgeon from another State, territory or district in which he resides when <u>in actual consultation</u> with a legal practitioner of this State; . . . nor shall the provisions of this Article apply to physicians or surgeons residing on the borders of a neighboring State, and duly authorized under the laws thereof to practice medicine or surgery therein, whose practice extend[s] into the limits of this State; provided, that such practitioners shall not open an office or appoint places to meet their patients or receive calls within the limits of this State without complying with the provisions of this Act[.]
>
> [1902 Md. Laws, ch. 612, § 1, at 889-90 (emphasis added); Md. Code, Health, Art. 43, § 61 (emphasis added).]

Throughout subsequent repeals, reenactments, amendments, recodifications, and changes to this article and subtitle, the 1902 language of the consultation exception and the out-of-state treating physician exception did not change until 1981.  <u>Compare</u> 1957 Md. Laws, ch. 29, § 2/138, at 40-41 (Feb. 1, 1957, effective June 1, 1957); 1963 Md. Laws, ch. 97, § 1/139, at 187-88 (Mar. 14, 1963, effective June 1, 1963); 1967 Md. Laws, ch. 398, § 1/139, at 966-67 (Apr. 21, 1967, effective June 1, 1967).  <u>See</u> <u>Aitchison</u>,

105 A.2d at 499-500 (listing statutory exceptions "to the broad definition of practitioner of medicine").

In 1981, as part of its Code revisions, the General Assembly repealed "Article 43, Health," and created a new "Health Occupations" Article by reenacting, revising, amending, and recodifying the laws relating to, among other occupations, practitioners of medicine. 1981 Md. Laws, ch. 8, §§ 1-10, at 53-760 (Mar. 23, 1981, effective July 1, 1981). See Blevins v. Baltimore Cty., 724 A.2d 22, 32-33 (Md. 1999) ("[T]he principal function of code revision 'is to reorganize the statutes and state them in simpler form,' and thus 'changes are presumed to be for the purpose of clarity rather than for a change in meaning.'") (quoting Bureau of Mines of Md. v. George's Creek Coal & Land Co., 321 A.2d 748, 754 (Md. 1974)).

One 1981 change eliminated the word "actual" from the consultation exception and adopted the language of HO § 14-302(a)(2), stating: "A physician licensed by and residing in another jurisdiction, while engaging in consultation with a physician licensed in this State" may practice medicine without a license. 1981 Md. Laws, ch. 8, § 2, at 564-65 (emphasis added). This language was in effect during the period of Brigham's conduct at issue, and remained in effect until the amendments in 2013,

73

discussed above.  2013 Md. Laws, ch. 582, § 2, at 5195, and ch. 583, § 2, at 5206.

We reject Brigham's argument that the BME erred by ignoring the expert testimony and inserting a new requirement into Maryland's statute that a consulting physician must examine the patient and/or possess specialized knowledge and expertise beyond that of the consultee or treating physician.  In Scholle, 46 A. at 327, the court explained that the reason for the consultation exception was to permit Maryland's patients and local physicians to "benefit [from] the advice of some of the most eminent and skillful gentlemen in the profession."  This presumes that the consulting physician will examine a patient and possess specialized knowledge and expertise beyond that of the consultee or treating physician.

In addition, we decline to discuss ex post facto laws and lenity rules, because the BME did not err in concluding the 2013 amendment to HO § 14-301(a)(2) clarified the meaning of "in consultation with" in effect during Brigham's conduct and was not a complete change in the law.  The BME's conclusion was supported by the Scholle court's explanation of the consultation exception together with the General Assembly's continuation over time of that exception and its out-of-state treating physician's exception.

The Scholle court, 46 A. at 327, explained in 1900 that without the consultation exception, patients and local physicians could be "occasionally" deprived of the advice of the most eminent and skillful out-of-state physicians. By contrast, since 1902, without a Maryland license, an out-of-state physician cannot practice medicine in Maryland in an office or appointed place to meet patients. When these two exceptions are read together, consultation historically implied occasional treatment. Indeed, this intent is reinforced by the language of the 2013 amendment to HO § 14-301(a)(2): "engaged in consultation with a physician licensed in the State about a particular patient and does not direct patient care[.]" Thus, the 2013 amendment did not create new law, and the BME did not err by using its language to define consultation.

When the Maryland General Assembly acts, it "is presumed to be aware of the interpretation that [the judiciary] has placed upon its enactments," Pack Shack, Inc. v. Howard County, 808 A.2d 795, 803 (Md. 2002) (quoting Waddell v. Kirkpatrick, 626 A.2d 353, 357 (Md. 1993)), and "it 'is presumed to be aware of its own [prior] enactments.'" Jane Doe v. Md. Bd. of Soc. Work Exam're, 862 A.2d 996, 1005 (Md. 2004) (quoting Md. State Highway Admin. v. Kim, 726 A.2d 238, 244 (Md. 1999)). The same presumptions

apply when our Legislature acts.  See In re Petition for Referendum on City of Trenton Ordinance 09-02, 201 N.J. 349, 359 (2010).

Further, as in New Jersey, subsequent legislative amendments of a statute, although not controlling as to the meaning of a prior law, may be "helpful" in determining legislative intent. Chesek v. Jones, 959 A.2d 795, 804 (Md. 2008).  See D.W. v. R.W., 212 N.J. 232, 250 (2012) (considering "[b]oth the plain language and historical evolution of" a statute to reveal legislative intent); TAC Assocs. v. N.J. Dep't of Envtl. Prot., 202 N.J. 533, 542 (2010) ("[A]mendments carry 'great weight' in determining the intention of the original statute.").

Brigham cites to parts of the legislative history of the 2013 amendment to prove it was a new change to the meaning of "consultation."  However, testimony before Maryland's House Health and Government Operations Committee on February 27, 2013, demonstrated that both the sponsor of Maryland's House Bill (HB) 1313, which later became the 2013 amendment, and the newly appointed head of the Maryland Board wanted the term "consultation" in HO § 14-302(a)(2) to be clarified.  Maryland delegate Bonnie L. Cullison testified that her bill, among other things, "clarifies consultation in a way that would allow national and international experts who are licensed in other jurisdictions to support the work in our teaching hospitals." Pub. Hearing Before House Health

& Gov't Operations Comm., HB 1313 (Md. 2013).[11] Dr. Andrea Mathias testified: "Our teaching hospitals are quite anxious to have the definition of consultation clarified." Ibid.

In Chesek, 959 A.2d at 804-05, the Court of Appeals held that a subsequent "clarifying" amendment to a statute may be an acknowledgement of an implied power already in existence. "The term 'clarifying' sometimes can be helpful in signaling legislative intent." Johnson v. Mayor & City Council of Baltimore, 61 A.3d 33, 45 (Md. 2013). However, absent additional evidence, the use of the phrase "clarifying" in a statute's legislative history, by itself, does not provide clarity as to legislative intent.

Here, the fact that the 2013 amendment simply clarified the meaning of "in consultation with" by acknowledging the meaning already in existence can be divined from the hearing testimony along with the history of Maryland's licensing exceptions, which includes the court's reasoning in Scholle and the General Assembly's treating physician exception. Thus, even if the subsequent 2013 amendment itself was not directly applicable to Brigham's conduct, any ambiguity in the definition of "in

---

[11]   View committee hearings at http://mgaleg.maryland. gov/webmga/frmMain.aspx?id=HB1313&stab=01&pid=billpage&tab=subje ct3&ys=2013RS.

consultation with" in HO § 14-302(a)(2) was clarified by the language in the amendment.

Finally, the BME did not err in concluding that the preponderance of evidence proved Brigham's conduct violated Maryland's licensing requirements to practice medicine and therefore revoking his license under N.J.S.A. 45:1-21(f). According to Scholle, 46 A. at 327, the public is protected from the possible incompetence of an out-of-state consulting physician "by the presence and supervision" of a Maryland physician. Although Brigham's motivation for consulting with Shepard did not matter under Maryland law, and neither did their written agreement, Brigham violated HO § 14-301(a)(2) by practicing medicine without a license, at the very least, every time Shepard was not physically present during an evacuation surgery.

Accordingly, we conclude the BME did not err in revoking Brigham's license under N.J.S.A. 45:1-21(f), as it did not misinterpret Maryland law and there was sufficient evidence supporting its decision that he engaged in acts constituting the unlicensed practice of medicine in Maryland.

V.

The BME alleged the medical treatment Brigham provided to his patients seeking late-term pregnancy terminations constituted gross negligence in violation of N.J.S.A. 45:1-21(c). The BME

concluded that "the established facts" supported a finding that Brigham's "conduct constituted gross negligence in each and every instance."

The BME initially explained this was "not a case focused on . . . Brigham's technical competency to perform a D & E, and that the record [was] devoid of evidence that any individual patient . . . suffered physical harm as a result of any termination procedure performed by . . . Brigham." Rather, the issue was "broader," and focused on "the risk of harm to which patients were exposed, and whether . . . Brigham's conduct endangered the health, safety and welfare of his patients."

Applying that broader focus, the BME concluded:

> [E]very patient treated in New Jersey by . . . Brigham was placed in harm's way once [he] commenced cervical preparation, because each patient then became committed to having a termination procedure performed in circumstances where their treating physician . . . knew that he could not legally perform the procedure in New Jersey, and knew or should have known that he could not legally perform the procedure anywhere else. The patients were further exposed to substantial risk of harm because . . . Brigham held no hospital or LACF privileges, and thus had nowhere in New Jersey (or any other state) where he could go to complete the termination procedures in the event of any emergency or unforeseen complications.

In fact, the BME found that the "latter point" was "particularly significant" because, even if Brigham "honestly believed his

practice in Maryland was legal, he had to know that there was a possibility that a patient could go into active labor, and that a termination procedure would need to be performed before a patient traveled to (or arrived in) Elkton on an emergent basis."

Although not directly made a basis for discipline, the BME observed Brigham's injections of Digoxin exposed his patients "to additional risk."  As such, the BME found there was

> nothing in the record below to suggest that . . . Brigham had any contingency plan for those patients, beyond possibly assuming that the patient would then be rushed to a hospital emergency room and have their care (and presumably their abortion procedures) completed by a physician who had no relationship with . . . Brigham or the patient.

Thus, concluding Brigham's "failure to have such back-up plans in place was a clear abrogation of his responsibility as a treatment provider and placed each and every patient at substantial risk of suffering grave harm," the BME held his conduct constituted gross negligence for revocation under N.J.S.A. 45:1-21(c).

Brigham argues the record did not support the BME's finding he was grossly negligent because he lacked a back-up plan for patients traveling from Voorhees to Elkton.  He further claims the BME never charged his lack of a back-up plan as gross negligence, so he had no notice until the BME raised it in its post-hearing exceptions to the ALJ's initial decision.

First, each version of the complaints in this matter[12] alleged the medical treatment Brigham provided to his patients past fourteen weeks LMP constituted gross negligence in violation of N.J.S.A. 45:1-21(c). Even though the complaints did not specifically allege Brigham lacked a medical treatment back-up plan, they were sufficient to fairly apprise him of the claims and issues against him.

The procedural requirements of our courts of law are not imposed on administrative agencies. In re Kallen, 92 N.J. 14, 25 (1983). Nevertheless, administrative contested cases must conform with due process principles. Ibid. Administrative due process is generally satisfied if "the parties had adequate notice, a chance to know opposing evidence, and the opportunity to present evidence and argument in response[.]" In re Dep't of Ins.'s Order Nos. A89-119 & A90-125, 129 N.J. 365, 382 (1992).

Here, the complaints charged Brigham with gross negligence and specifically alleged he commenced his patients' late term pregnancy terminations in New Jersey when he administered Laminaria, Misoprostol, or Digoxin, knowing he could not legally perform the required evacuation surgeries in New Jersey. Furthermore, the evidence included discussions of whether Brigham

---

[12] The BME filed a first, second, and third amended complaint.

could perform the evacuation surgeries on his patients after treating them with the prefatory steps for dilation and/or fetal demise to that surgery. Thus, Brigham had adequate notice of the gross negligence charges filed against him.

Second, the record shows the emergency room director at a Delaware hospital assured Brigham the hospital would care for any of his patients in case of an emergency while on route to Elkton. However, the BME's decision on gross negligence was not dependent upon whether Brigham had a back-up plan in Delaware for his patients, or whether he legally could perform evacuation surgeries in Maryland. Rather, the BME found he endangered his patients by commencing dilation and/or fetal demise in New Jersey while knowing he was not able to legally perform their evacuation surgeries here, within the BME's jurisdiction.

A physician is merely negligent when he or she fails to exercise the degree of care that a reasonably prudent physician would exercise under similar circumstances. Schueler v. Strelinger, 43 N.J. 330, 344-45 (1964). Gross negligence, however, refers to conduct that demonstrates a conscious or reckless disregard for the safety or welfare of another. In re Suspension or Revocation of License of Kerlin, 151 N.J. Super. 179, 185-86 (App. Div. 1977). In holding that basic tort liability concepts are not applicable in professional disciplinary actions, the court

stated in Kerlin: "It is obvious that the terms 'neglect' and 'malpractice,' standing alone, import a deviation from normal standards of conduct. 'Gross neglect' or 'gross malpractice' suggest conduct beyond such wrongful action - how far beyond has been left to the judgment of the Board, subject, of course, to judicial review." Id. at 186.

Here, the BME relied on its own professional expertise to find Brigham exposed his patients to harm by his lack of hospital or LACF privileges in New Jersey. "While the Board, sitting in a quasi-judicial capacity, 'cannot be silent witnesses as well as judges,' an agency's 'experience, technical competence, and specialized knowledge may be utilized in the valuation of the evidence.'" In re Suspension or Revocation of License of Silberman, 169 N.J. Super. 243, 256 (App. Div. 1979) (citation first quoting N.J. State Bd. Optometrists v. Nemitz, 21 N.J. Super. 18, 28 (App Div. 1952); then quoting N.J.S.A. 52:14B-10(b)), aff'd o.b., 84 N.J. 303 (1980).

The BME's decision that Brigham's patients were exposed to harm by his lack of hospital or LACF privileges to deal with unforeseen complications was supported by a preponderance of the credible evidence in the record. For example, Brigham treated patient J.P., a Grace patient who was in her second trimester, by inserting Laminaria and injecting Digoxin in a New Jersey office.

His plan was that after a night in a New Jersey hotel, J.P. would travel to Maryland for the evacuation surgery. However, that night, J.P. had an emergency and was admitted to a New Jersey hospital and treated by other physicians, not Brigham.

Brigham claims, however, that J.P. had no medical emergency and the police prevented him from communicating with her. His argument avoids the undisputed fact that after performing the prefatory steps in New Jersey, he could not have treated J.P in an emergency by continuing his treatment for pregnancy termination here.

The record supported the BME's holding that Brigham's conduct constituted gross negligence. Lichtenberg testified that Brigham's conduct in undertaking cervical preparation in New Jersey with a plan only to perform the surgery in Maryland was a "gross and serious deviation" from the "accepted standards of care." He also stated that Brigham had committed a gross deviation when he breached his patients' trust by committing them to a procedure he could not legally perform.

Because J.P.'s treatment and Lichtenberg's opinions supported the BME's finding, it was a proper exercise of the BME's power. Silberman, 169 N.J. Super. at 255-56. Hence, we find the BME did not err in revoking Brigham's license under N.J.S.A. 45:1-21(c),

as there was sufficient evidence in the record to support its decision that he had engaged in gross negligence.

VI.

Brigham contends the BME erred in revoking his license under N.J.S.A. 45:1-21(b) and (h) by finding evidence of serious and substantial recordkeeping deficiencies violating N.J.A.C. 13:35-6.5. This contention lacks merit.

Under N.J.S.A. 45:1-21, the BME may revoke any license to practice medicine and surgery "upon proof" that the licensee "[h]as engaged in the use or employment of dishonesty, fraud, deception, misrepresentation, false promise or false pretense," N.J.S.A. 45:1-21(b), or "[h]as violated or failed to comply with the provisions of any act or regulation administered by the board," N.J.S.A. 45:1-21(h). The standard of proof is by a preponderance of the evidence. Polk, 90 N.J. at 560.

Subchapter 6 of N.J.A.C. 13:35 contains the BME's general practice rules and includes a regulation that controls the preparation of patient records. N.J.A.C. 13:35-6.5. During the period at issue, N.J.A.C. 13:35-6.5(b)(1) provided as follows, in pertinent part:

> (b) Licensees shall prepare contemporaneous, permanent professional treatment records.

. . .   All treatment records . . . <u>shall</u> accurately reflect the treatment or services rendered. . . .

1.   To the extent applicable, professional treatment records <u>shall</u> reflect:

i.   The dates of all treatments;

ii.   The patient complaint;

iii. The history;

iv.  Findings on appropriate examination;

v.   Progress notes;

vi.  Any orders for tests or consultations and the results thereof;

vii. Diagnosis or medical impression;

viii.   Treatment ordered, including specific dosages, quantities and strengths of medications including refills if prescribed, administered or dispensed, and recommended follow-up;

ix.  The identity of the treatment provider if the service is rendered in a setting in which more than one provider practices; [and]

. . . .

xi. . . .  The treating doctor shall also make and document specific inquiry of or regarding a patient in appropriate circumstances, such as . . . where surgery is anticipated with use of general anesthesia.

A-1944-14T1

A licensee may make "[c]orrections/additions" to an existing record, "provided that each change is clearly identified as such, dated and initialed by the licensee." N.J.A.C. 13:35-6.5(b)(2). The regulation was amended in June 2011, but no changes were made to the portions quoted above, 43 N.J.R. 1359(b) (June 6, 2011) (adoption).

The BME adopted the ALJ's finding that Brigham violated N.J.A.C. 13:35-6.5. The ALJ found the evidence proved Brigham's patient records "were, at least upon facial examination, confusing." The "Abortion Record" of each patient identified both that she had a spontaneous unassisted abortion, which was incorrect, and the equipment and methods used to evacuate the fetus and placenta. The ALJ found these "confused" records violated the mandate in N.J.A.C. 13:35-6.5 of maintaining accurate records, but agreed with Lichtenberg's characterization that the "deviations from the proper professional standard regarding keeping of accurate records" were "not serious." The ALJ stated that "[a]nyone who had reason to examine the record could readily see that it was not a record of spontaneous delivery, and the specific means utilized to effectuate the delivery are readily identified."

The ALJ also found that Brigham's Informed Consent forms were "not appropriately clear" because they stated the patient, who was

requesting a "medical abortion," was required to give her consent to a "surgical abortion." The ALJ concluded that this, too, only was "a minor violation of standards."

However, the BME rejected the ALJ's characterizations that Brigham's recordkeeping violations were minor. Instead, it concluded the violations were "'substantial' and 'serious,'" finding Brigham had "consistently prepared records in a manner that likely would deceive anyone reading his records (at a later date) regarding the specific identity of the physician who performed the abortion or the specific procedure performed." The BME focused on the following violations: (1) "Brigham's consistent practice of falsely representing [on each patient's] "Abortion Record" that the patient had spontaneously delivered the fetus and placenta"; (2) Brigham's practice of identifying only Shepard, and never himself, as the "doctor" on the "Recovery Room Log" maintained at the Elkton office for all patients; and (3) Brigham's practice of leaving blank the identity of the physician performing the patient's evacuation surgery on her "Informed Consent" form.

As to entries on the Abortion Records, the BME concluded that, while the "mistake" of indicating a spontaneous delivery instead of a surgical abortion "could certainly be excused as a record-keeping error in an isolated instance, it instead was clearly a deliberate practice as the same error was made in each

and every case."  As such, the BME "infer[red] that the practice was done to mislead or confuse anyone subsequently reading or reviewing . . . Brigham's records as to what actually occurred." It rejected any testimony that a subsequent reader would be able to determine from the entire document what actual treatment had been performed, since it was unreasonable to assume that the reader would have "a level of experience and sophistication similar to that of the two expert witnesses."

As to entries on the Recovery Room Logs, the BME concluded that because Shepard's name alone was listed as the doctor, the logical inference one reviewing the logs would draw is that Shepard performed each surgery.

As to the Informed Consent forms, the BME acknowledged that Brigham's name was sometimes identified on the form as the physician who would be performing the patient's abortion, and that all of the forms were maintained within a larger patient record wherein his name was identified.  However, the BME declared that "one reviewing the Informed Consent form alone would again have no way to know that . . . Brigham was the physician who was to perform the abortion."  Indeed, relying on its "collective expertise," the BME concluded that "such practice is inconsistent with general standards for obtaining and recording an informed consent."  It therefore concluded that "[w]hile the failure to

have identified . . . Brigham on an Informed Consent form could again readily be excused, or considered to be a 'minor' violation in any isolated instance, the consistency of the practice renders the violation far more concerning."

Viewing the violations on the Abortion Records, Recovery Room Logs, and Informed Consent forms in the aggregate, the BME concluded Brigham's "misleading record-keeping practices support a conclusion that he engaged in the use or employment of dishonesty, deception or misrepresentation." The BME stated:

> [E]ach deceptive practice was done to mislead and confuse a subsequent reader of . . . Brigham's records, and to generally obscure the truth about the actual procedure performed and the identity of the physician who performed the procedure. We thus conclude, based on record-keeping practices alone, that . . . Brigham should be found to have violated N.J.S.A. 45:1-21(b), and should be subject to penalty for that reason as well as for the reason that his records failed to conform to the requirements of the Board's record-keeping regulation, N.J.A.C. 13:35-6.5 in turn providing basis for disciplinary sanction pursuant to N.J.S.A. 45:1-21(h).

The BME, however, declined to find that Brigham's recordkeeping constituted fraud and limited his violations of N.J.S.A. 45:1-21(b) to his engaging "in the use or employment of dishonesty, . . . deception, misrepresentation, false promise or false pretense[.]"

Brigham does not challenge the BME's factfindings. Instead, he argues the BME erred by not considering all of the evidence presented before it concluded his recordkeeping deficiencies were substantial, serious, and deceptive. He claims there was no evidence of intent to hide his identity in the records from any subsequent reader or his patients. For example, as to the Abortion Records, he asserts these documents were not prepared to deceive a subsequent reader. He explains that aside from the records impounded by the police before he had time to complete them, he included his name as the physician who removed the fetus while engaging in consultation with Shepard. He also claims patient records are prepared for medical professionals, and they would know from the notations in the document that surgical procedures were performed even though the box for spontaneous delivery was marked. Furthermore, any subsequent reader with "a modicum" of medical knowledge also would understand the records.

As to the Recovery Room Logs, Brigham asserts he had nothing to do with the entry notations and points to C.R.'s testimony that she made them at Shepard's direction. He further claims, because the patient records were replete with statements that he performed the surgical procedures, anyone who reviewed them could not have been misled.

As to the Consent Forms, he asserts they were not deceptive, even though these preprinted forms did not include the name of the physician, because every patient had met him personally and knew he would be performing the abortion. Also, his signature was on every Laminaria insertion sheet and procedure record. Finally, he points to testimony that the forms were completed without adding his name.

Licensed physicians have a "duty to ensure that '[a]ll treatment records . . . accurately reflect the treatment or services rendered.'" Rosenblit v. Zimmerman, 166 N.J. 391, 399 n.1 (2001) (alterations in original) (quoting N.J.A.C. 13:35-6.5(b)(2)). Further, N.J.A.C. 13:35-6.5(b) mandates that all treatment records "accurately reflect" the treatment or services rendered, and N.J.A.C. 13:35-6.5(b)(1)(ix) requires treatment records to reflect "[t]he identity of the treatment provider if the service is rendered in a setting in which more than one provider practices."

It is undisputed the Abortion Records incorrectly indicated spontaneous abortions had occurred, Brigham's name never appeared on the Recovery Room Logs, and the majority of preprinted "Informed Consent for Abortion after 14 Weeks" forms were blank where the name of the doctor who would perform the surgery should have been inserted. Moreover, Brigham admitted to completing patient

records well after treatments, which Lichtenberg found was unreasonable.

The BME's decision that Brigham's recordkeeping violations constituted acts of dishonesty, deception, misrepresentation, false promise or false pretense under N.J.S.A. 45:1-21(b) is entitled to deference, as the evidence and inferences that could be drawn therefrom support this conclusion. Although we will not simply rubberstamp an agency's decision, we "may not 'engage in an independent assessment of the evidence as if [we] were the court of first instance.'" In re Taylor, 158 N.J. 644, 656-57 (1999) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). Even if other evidence in the record allowed for a contrary result, the BME understood the issues and the relevance of the information in the patient records. We should not substitute our "views of whether a particular penalty is correct for those of the body charged with making that decision." Stallworth, 208 N.J. at 191 (Citation omitted). "If . . . [we are] satisfied after [our] review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then [we] must affirm even if we would have reached a different result itself." Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988).

Further, Brigham's recordkeeping violations independently provided sufficient grounds for the BME to revoke his license and

impose sanctions under N.J.S.A. 45:1-21. In <u>In re Suspension or Revocation of License of Jascalevich</u>, 182 N.J. Super. 455, 457-58 (App. Div. 1982), we upheld the BME's license revocation of a physician who was charged with, among other things, violations of his recordkeeping responsibilities. We stated:

> We are persuaded that a physician's duty to a patient cannot but encompass his affirmative obligation to maintain the integrity, accuracy, truth and reliability of the patient's medical record. His obligation in this regard is no less compelling than his duties respecting diagnosis and treatment of the patient since the medical community must, of necessity, be able to rely on those records in the continuing and future care of that patient. Obviously, the rendering of that care is prejudiced by anything in those records which is false, misleading or inaccurate. We hold, therefore, that a deliberate falsification by a physician of his patient's medical record, particularly when the reason therefor is to protect his own interests at the expense of his patient's, must be regarded as gross malpractice endangering the health or life of his patient.
>
> [<u>Id.</u> at 471-72.]

Accordingly, we find the BME did not err by concluding Brigham committed serious and substantial recordkeeping violations. We further find, based on a physician's duty to ensure accurate treatment records, that these violations independently provided sufficient grounds for the BME to revoke Brigham's license and impose sanctions under N.J.S.A. 45:1-21(b) and (h).

VII.

Lastly, Brigham contends that the sanctions of license revocation, penalties, and costs are not sustainable by the BME's conclusions that he had violated the TOP rule, engaged in the unlicensed practice of medicine in Maryland, and committed recordkeeping violations. Making no specific arguments, he generally claims the BME's conclusions are not supported by the facts and are contrary to New Jersey and Maryland law. In his reply brief, he asserts that the BME's bias and unfairness was due to the fact that this matter concerned "the explosive issue" of late term abortions.

"[T]here is no doubt of a court's power of review under the tests of illegality, arbitrariness or abuse of discretion and of its power to impose a lesser or different penalty in appropriate cases." Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973). However, our "review of an agency's choice of sanction is limited." Zahl, 186 N.J. at 353. As a general rule, we "accord substantial deference to an agency head's choice of remedy or sanction, seeing it as a matter of broad discretion, especially where considerations of public policy are implicated." Div. of State Police v. Jiras, 305 N.J. Super. 476, 482 (App. Div. 1997) (citations omitted).

A-1944-14T1

We may set aside a sanction only "where [we are] satisfied that the agency has mistakenly exercised its discretion or misperceived its own statutory authority."  Polk, 90 N.J. at 578.  The test is "whether such punishment is 'so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.'"  Ibid. (quoting Pell v. Bd. of Educ., 356 N.Y.S.2d 833, 841 (1974)).  Where a penalty or sanction is found to be in error, we may "finally determine the matter by fixing the appropriate penalty or remand it to the [agency] for redetermination."  Henry v. Rahway State Prison, 81 N.J. 571, 580 (1980).

As we previously explained, the MPA grants the BME "broad authority" to regulate the practice of medicine.  Zahl, 186 N.J. at 352.  The UEA allows the BME to revoke a physician's license by finding a preponderance of the evidence that the physician violated any of the subsections in N.J.S.A. 45:1-21.  Polk, 90 N.J. at 560.  In addition to license revocation, the BME may assess civil penalties against the physician under N.J.S.A. 45:1-22.  Neither of those statutes requires patient harm before authorizing revocation.  Zahl, 186 N.J. at 355.

Thus, even though we reverse the BME's finding that Brigham's conduct violated the TOP rule, there was ample evidence to support its conclusions that he violated N.J.A.C. 13:35-6.5 by keeping

deficient patient records, and engaged in gross negligence and practiced medicine without a license in Maryland.

Furthermore, the BME concluded that Brigham had "repeatedly withheld pertinent, if not crucial, information from his patients," in violation of N.J.S.A. 45:1-21(b). Most importantly, it explained

> that each and every patient treated by . . . Brigham had a right to know, and should have been told, what . . . Brigham himself knew namely, that he could not legally perform an abortion in New Jersey. Each and every patient had a right to know that, in the event there was any emergency requiring hospitalization in New Jersey before the time of the scheduled procedure, . . . Brigham could not have performed their abortion in New Jersey, and could not even have been involved in their care because he held no hospital privileges. Each and every patient should likewise have been told that her abortion would be performed in Maryland rather than in New Jersey, and should have been given far more specific information about the nature and location of the facility where . . . Brigham intended to perform the abortion. Similarly, each and every patient had a right to know, and should have been told, that . . . Brigham was not in fact licensed in Maryland, that his intent was instead to rely on an exemption to Maryland licensure law and to perform [the] abortion "in consultation" with . . . Shepard.

> Whether those disclosures would or would not have changed patients' elections to have . . . Brigham perform their procedure is speculative but ultimately irrelevant - what is relevant is that those were crucial facts and key elements necessary to allow a patient to make a knowing and informed choice about

her care options. . . . Brigham's failure to be forthright and honest with his patients corrupted the informed consent process and fundamentally shattered the trust inherent in the physician-patient relationship.

Finally, based on the constellation of factual findings and conclusions above, we are convinced and specifically conclude that the allegations that . . . Brigham engaged in professional misconduct, and thereby violated N.J.S.A. 45:1-21(e), are fully supported on the record below. . . . Brigham went to great lengths to create a thick haze to shroud his practice from scrutiny by licensing authorities in Maryland and New Jersey, and even to keep his patients from learning critical information. He repeatedly and consistently prepared his records in ways designed to confuse or obscure any review of both who was doing, and what was being done, in Elkton.

Those acts evidence a fundamental lack of candor and ultimately evince a brazen disregard and disrespect of the rights of patients, as well as for the authority of licensing agencies and the need for those agencies to be able to protect the public interest. They are thus acts which support, if not dictate, a conclusion that . . . Brigham engaged in professional misconduct.

The record amply supports the BME's conclusions and its decision is entitled to deference based on its expertise and legislative authority. Further, the BME followed the law and its regulations governing the grounds for revocation and sanctions, considered all factors relevant to Brigham's continued licensure, and weighed the public interest and the continued need for

pregnancy termination services against countervailing concerns that society be protected from professional ineptitude. Accordingly, we find the BME's sanction of license revocation is not "shocking to one's sense of fairness." Polk, 90 N.J. at 578.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1944-14T1